## Weston *versus* The Commonwealth.

1. On the trial of one who is indicted with others for murder, but who is not alleged to have actually struck the blow causing death, it is not error to charge that the defendant was guilty if he were present at the scene of the killing, aiding and abetting in the purpose for which he and those with him were there, and the killing was in pursuance of or an incidental probable consequence of such purpose. An intent to hold possession of disputed land by a show of arms is unlawful, and draws to it the consequences of all acts done in carrying it into execution.

2. A juror is not disqualified because he has read the newspaper account of the trial of one jointly indicted with the defendant, and the newspaper report of the testimony taken at the said trial, if he has not formed a fixed opinion as to the guilt of the defendant himself.

3. On the trial of one charged with murder, testimony that the defendant had consulted counsel, and had by counsel been advised that he had a legal right to maintain possession of the land, in a dispute about which the alleged murder took place, is not admissible in evidence.

November 9th, 1885. Before Mercur, C. J., Gordon, Paxson, Trunkey, Sterrett, Green and Clark, JJ.

Error to the Oyer and Terminer of *Allegheny county:* Of October and November Term, 1885, No. 45.

Absalom M. Bowser, Sherman Kelso, Milton Weston, Archibald Blakely and several others were indicted in the Oyer and Terminer of Westmoreland county for the murder of Obadiah Haymaker. On account of the excitement caused in the neighborhood by the circumstances of the killing, the venue of the trial was changed to Allegheny county. The defendants severed in their defence. Bowser was tried and convicted of murder in the second degree.

[Weston *v.* The Commonwealth.]

Subsequently on February 17th, 1885, the defendants Weston, Miller, Remaley, Johnston, Blakely and Miller were arraigned and pleaded not guilty. A severance being prayed and allowed, the Commonwealth elected to try Milton Weston, and the empannelling of the jury was proceeded with. A. M. Burns, called as a juror, testified on his *voir dire* that while he had not formed an opinion as to the guilt of Weston particularly, yet upon reading the newspaper accounts of the trial of Bowser, he had formed and expressed an opinion upon the guilt or innocence of Weston and those connected with him ; that the opinion was not a fixed one, but nothing more than an impression not amounting to a belief. The defendant challenged the juror for cause. Challenge overruled and juror sworn. Exception taken.

Addison Lisle, called as a juror, testified that he had read the newspaper reports of the occurrences involved in the case, of the trial of Bowser, and of testimony taken in *habeas corpus* proceedings in the case, but had nothing more than an impression as to the guilt or innocence of Weston and his associates. Challenge overruled. Juror sworn. Exception taken.

D. B. Morris, called as a juror, had read the newspaper accounts of the occurrence, of the testimony taken at the trial of Bowser, of the coroner's inquest, and of the *habeas corpus* proceedings ; had formed an opinion as to the guilt of Weston and party, but not such an one as would influence him in rendering a verdict. Challenge overruled. Juror sworn. Exception taken.

J. G. Weldon, called as a juror, had read very little about the case ; had formed a strong impression about the guilt or innocence of Weston and his associates, but not one which would influence him in rendering a verdict. Challenge overruled. Juror sworn. Exception taken.

W. C. McEhaney, called as a juror, had read the newspaper accounts of the occurrences, and of the testimony at the Bowser trial, but had nothing more than an impression with reference to the guilt or innocence of the defendant and his associates. Challenge overruled. Juror sworn. Exception taken.

Charles McClelland, called as a juror, had not formed or expressed an opinion as to the guilt or innocence of Weston individually, but had with reference to the whole party, based on newspaper accounts of the occurrence, and the testimony at the Bowser trial, but not such an opinion as would interfere with his rendering a verdict according to the law and the evidence. Challenge overruled. Juror sworn. Exception taken.

After a jury had been obtained and sworn, the Common-

wealth gave evidence tending to establish the following case : On the 26th of November, 1883, Bowser, Remaley, Kelso and others went upon certain premises in Murrayville, Westmoreland county, on which was a natural gas well, and which for convenience are called in this report the gas well tract, and proceeded to take possession of said tract for Weston, the defendant, and went upon a derrick used for boring purposes. While they were upon the premises, Obadiah Haymaker who with others had been in possession of the premises in the interest of Pew & Emerson, came on the premises, and being told by one of the workmen, " Mr. Weston's party is going to take the well," entered into conversation with Bowser, after which a shot was fired, by whom it did not appear, and Haymaker was set upon by the Weston party, clubbed over the head with a gun and beaten ; his brother who arrived on the ground about the time of this occurrence ran up and got him away ; after this the Weston party began to carry away boards from a board pile some fifty or seventy-five feet away from the derrick, and carried them over to the derrick, which they began to board up. Haymaker went to the pile to prevent the carrying away of the boards which belonged to his employers, and met some other men ; got on top of the pile ; the Weston party approached armed with guns and bayonets ; Bowser advanced and thrust at Haymaker with his bayonet striking him several times ; Haymaker moved about on the board pile swinging a pick handle backward and forward ; Bowser stepped back and fired, this shot was followed by a volley from the Weston party ; Haymaker fell, was carried by a man named Taylor to a short distance from the board pile, from whence, after receiving medical attention, he was removed to his home, where he died at half-past three o'clock in the afternoon of the day on which the above mentioned occurrences took place. His body showed that three or four holes had been made in it, and one was from a gun shot. There was evidence that Weston had been on the ground during the trouble, that he had fired at least one shot ; and that on the previous day he had hired from a gunsmith in Pittsburgh six Springfield rifles with bayonets, and six double-barrelled shot guns, of the same pattern as guns produced in court, identified as those used in the affray, and had also purchased from him a supply of ball cartridges and blank cartridges, which he ordered to be sent to " M. Weston," or " M. Weston & Co.," directing the cartridges to be put up so that unused or unopened packages could be returned, saying that he did not think any of them would be used in firing.

The defendant gave testimony to the effect that in August, 1883, a party sent by Weston who claimed to have purchased

the well, went upon the well tract, and on the 7th were assaulted by the employees of Pew & Emerson; that they remained on the ground, but were again threatened; that a riot for the possession of the tract was so imminent that the sheriff was, on the 10th of September, obliged to summon a *posse* to preserve the peace; that after this, on the 24th of September, the Pew & Emerson party expelled the Western party from the well tract by force; that on the day of the killing there were some one hundred and twenty-five men of the Pew & Emerson party on the ground armed with pick handles; that a number of them stood upon the board pile striking with their pick handles, and that the firing followed after this demonstration.

Counsel for the defendant then proposed to ask a witness if he knew the advice of Archibald Blakeley, Esq., to the defendant Weston as to his title to the property? This was objected to.

The defence then offered to prove that the defendant submitted his title to this property to competent counsel; that he was advised that he had a good and sufficient title in that property; that he was advised that the agreement between him and Mr. Brunot, and others included in it, was an absolute sale of the property to him; that he was advised that he had a right to take possession of the property, peaceably if he could; that he was advised that after he had the possession of the property, he had a right, he and those with him, to bear arms there for the purpose of preventing, by a show of arms, people from interfering with his possession; that he had a right to hold possession, using only such force as was necessary so to do, short of the taking of life or doing great bodily harm; that he was advised that under the Constitution he had a right to bear arms in defence of his person and property; and that for the purpose as suggested in the opening—of showing the right which the defendant had to be upon the ground; the reason he had to believe that he had a right to be upon the ground, and to explain why he, and those with him, were in that vicinity, neighborhood, and upon the ground with arms; to explain why he believed, or had a right to believe, that he had a right to go there with arms; to explain how he was to take, and why he took possession of this property, and why he attempted to hold possession of the property; and to rebut the idea that might get into the minds of the jury that it was a conspiracy to go there and kill people. Objected to.

The defence then made the following offer to prove by the witness on the stand, W. H. Mechling, that he, the defendant, submitted his title to the property, on which the alleged crime was committed, to competent counsel, and was advised that

[Weston v. The Commonwealth.]

his title was good, and that he could take possession of the same if he could get the possession by peaceable means. And he was advised that he might legally take there on the premises firearms, for the purpose of intimidation, and a show of force, to prevent himself from being dispossessed by others. And that the defendant, acting on such advice of counsel, did procure some firearms for the purpose aforesaid, and had them taken on the premises after he had obtained possession peaceably, and without any intention of committing unlawful violence. And that all this was done in pursuance of the advice of counsel, and this for the purpose of rebutting the inference of malice, and for the purpose of mitigating the grade of the offence, if any.

This testimony to be taken in connection with the testimony already in evidence; and that Mr. Mechling was present at the time the advice was given. This was objected to for the following reasons:

1st. Because the witness on the stand having already stated that Colonel Blakeley was the legal adviser of Weston, the defendant, the advice would be the declaration of an accomplice; therefore inadmissible.

2d. Because no advice of counsel is a legal protection for the commission of crime.

3d. Because the offer proposes to show, which the testimony could not, the intention of the defendant on the day of the commission of this offence and in the commission of the act.

4th. Because the testimony is hearsay.

5th. Because if Colonel Blakeley was called as a witness to prove the advice given by him on behalf of the defendant Weston, he would not be admissible as a witness, nor his testimony be received. What he could not do himself, and directly, he cannot do through another, and indirectly.

BAILEY, J., after inquiring whether Colonel Blakeley was the Blakeley named in the indictment, and receiving an affirmative answer, sustained the objection.

The defendant presented to the court several points which with the answers thereto are set forth in the charge of the court, which was as follows:

It becomes my duty, gentlemen, at this point to instruct you as to the principles and rules of law applicable to the facts disclosed by the testimony which has been given in your hearing. The Supreme Court of this state have pronounced you "judges of the law and the facts," and have in the same connection decided, "The court is appointed to instruct the jury, and their opinion is the best evidence of what the law is." Under these circumstances, in order that you may be pos-

sessed of the best evidence upon this subject in my power to give you, I propose to read from opinions of our Supreme Court, from approved works on criminal law, and at length from a charge of the late Chief Justice AGNEW, which has been practically adopted by the Supreme Court and accepted as law by my predecessors and colleagues.

I here premise that you start in your investigation, with the presumption of the innocence of the defendant of the crime laid to his account. "As men do not generally violate the penal code, the law presumes every man innocent, but some men do transgress it, and therefore evidence is received to repel this presumption." My mind has always assented to the view of the law set forth by a distinguished writer upon the law of evidence, that "this legal presumption of inno-cence is to be regarded by the jury as matter of evidence to the benefit of which the party is entitled." I add that this presumption of innocence, and the kindred rule that the evi-dence must satisfy the jury of the criminality of a defendant beyond a reasonable doubt are not concessions to guilt, nor contrivances by which criminals may break through the meshes of the law, but are, on the contrary, provisions for the protec-tion of the innocent, the reasonableness and necessity of which have been demonstrated by the experience of ages. In therefore carefully applying these legal principles to the case in hand, you need feel no anxiety lest you may be letting go some of the safeguards against crime, but rest content that you are conforming to the law and sound reason. I had pre-pared what I shall hereafter read you, before defendant's coun-sel had presented their prayer for instruction. It will be seen that I had necessarily anticipated many of the subjects referred to therein, and as in most cases, I have passed upon those sub-jects at greater length than is usual in answer to legal points. I will at this place read and briefly answer the latter.

The court is respectfully requested by defendant's counsel to charge the jury:

1. That under the Constitution of the United States and of this Commonwealth, the right of the people to keep and bear arms cannot be questioned, and under the said Constitution the right of acquiring, possessing and protecting property is one of the indefeasible rights of every citizen.

This point is correctly taken from our Constitution, and if their provisions can assist you in determining the issue you have been sworn to try, you will apply them.

2. Whilst the law presumes every unlawful killing, with malice express or implied, to be murder; that presumption rises no higher than murder at common law, under our statute murder of the second degree, until shown by the Common-

wealth to be murder of the first degree. It therefore lies upon the Commonwealth to satisfy the jury of those facts and circumstances which indicate the deliberate intention, and the cool depravity of heart, and the conscious purpose which constitute murder of the first degree. Affirmed.

3. In the consideration of this cause it is the imperative duty of the jury to exclude from their minds all public clamor and prejudice, the law and the evidence should be their only guides in determining the question submitted to them, to wit, has the Commonwealth established, by clear and satisfactory evidence, that the defendant is guilty as charged? Affirmed.

4. That the burden of proof to establish the charge against the defendant is upon the Commonwealth, and if the Commonwealth fail to prove any one of the material elements of the crime charged, or the commission of the act of murder, or the identity of the defendant as the actor, it is the duty of the jury to acquit the defendant.

You will remember that you are not limited in your verdict to finding the defendant guilty of murder of the first or second degree, but that, if the facts and law warrant, you can find him guilty of voluntary manslaughter. The use of the phrase "the defendant as the actor," does not mean that in order to convict the defendant, you must find that he inflicted wounds which caused death. Of this, I will have more to say in the general charge. With this explanation, this point is affirmed.

5. That if the jury, in a trial for murder, can reconcile the circumstances under which the killing took place, with the prisoner's innocence of an intent to take life or do great bodily harm, they are bound to do so. Affirmed, as a legal proposition.

6. Unless there was a precedent common purpose to kill or to do great bodily harm, the defendant, Weston, cannot be convicted, in the absence of satisfactory proof, beyond a reasonable doubt, that he aided, assisted or abetted him who did it. Affirmed.

6½. If the jury believe from the evidence in the case that the defendant, Weston, was on the 26th day of November, A. D. 1883, in the possession of the property on which deceased received the injuries from which he afterwards died, and that he took possession of said property under a claim of title and a title that he believed to be good, and that he took thereon firearms for the purpose of intimidating any person or persons who might attempt to dispossess him from said premises, and without any design or purpose of taking human life, doing great bodily harm, and that deceased coming on the premises afterwards was suddenly attacked and assaulted by one Bow-

1 AMERMAN—17

ser, who inflicted injuries upon him from which he afterwards died, he cannot be held responsible and the jury should acquit the defendant.

This point, as drawn, is affirmed. You will see that it ignores the alleged facts, that Bowser was brought there by and was acting for this defendant, that he was armed with a gun and bayonet also brought there by this defendant, and the further alleged fact that this defendant was present, aiding and abetting in the purpose for which men and arms were brought there by him.

7. No acts of this defendant committed, nor declarations made, after the injury which caused the decedent's death can render him liable to conviction.

Affirmed, but you can use such acts and declarations if they will assist you in determining any questions involved in your considerations.

8. The defendant, and those with him, having taken possession of the premises, where the deceased was injured, without opposition and peaceably, if their intention only was to hold the same by a show of arms, for intimidation only, and one of their number suddenly and in a moment of passion or fear superinduced by an attack by a large body of men armed with pick handles, killed one of the latter, this defendant cannot be convicted, unless beyond all reasonable doubt he aided or assisted in the killing.

Modifying the last line so as to read, "he was present, aiding or abetting in the purpose for which he and those with him were there, and the killing was in pursuance of or an incidental probable consequence of such purpose," the point is affirmed.

9. If the intent of this defendant was only to hold possession of the premises which he had taken without hindrance or opposition, and which he believed he had a right to take and hold, by using only lawful means and using no more force than was necessary so to do, without intending to use a deadly weapon upon any who might attempt to dispossess him, he would not be responsible for the homicide, although the slayer unknown to him, might have intended his act. The defendant must have had the same intent as the principal or he must be acquitted.

The point, as drawn, is refused. The first clause is ambiguous and the last is inaccurate.

10. The jury cannot find from the evidence and circumstances of this case, that the defendant, and those with him, went to, or were upon the premises where the killing occurred, with the common design to kill or commit any felony, and

[Weston v. The Commonwealth.]

therefore, if a homicide occurred only he who did it and those who aided or abetted him, could be held responsible.

Refused, because the facts are for you, and because it excludes a possible part of the case.

11. If the court should refuse the foregoing point, then it is respectfully asked to charge : That unless the jury find from the facts, evidence and circumstances of this case, that the defendant, Weston, and those with him, went to, or were upon the premises where the killing occurred, with the common design to kill, or to commit some felony, none but he who did the killing or those who aided and abetted him therein can be held responsible.

Refused, because it would require much modification to warrant its affirmance.

12. That loose declarations or admissions of a defendant when under the influence of great excitement should be received by the jury with great care and caution. Such declarations are the weakest and most uncertain evidence admitted by the law, and are not entitled to that respect and confidence which flow from the calm admissions of a party in the presence of a minister of the law.

These views are rather addressed to you than to the court, and are submitted for your consideration.

13. Whilst in a civil issue, involving pecuniary interests, it is the duty of a jury to weigh the evidence and render a verdict according to the weight of the evidence, in a criminal case, involving the life or liberty of a citizen, no mere preponderance or weight of evidence is enough. The evidence must satisfy the conscience of the jury of the guilt of the defendant beyond all reasonable doubt; or if the jury, after a calm and full review of all the testimony, have a reasonable doubt of the guilt of the defendant, it is their duty to render a verdict of acquittal. Affirmed.

14. Evidence of good character is not a mere make-weight thrown into a case to assist in the production of a result that would happen at all events, but it is positive evidence, and may of itself, by the creation of a reasonable doubt, produce an acquittal. Affirmed.

15. A reasonable doubt arises upon a case which, after comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge against the defendant, or is such want of confidence in the result of thought or investigation as would prevent a reasonable and prudent man from coming to a satisfactory conclusion about an important matter in the business of life. Affirmed.

16. That the burden of proof never shifts but remains on the Commonwealth throughout, and if, from the evidence, a reasonable doubt arises the defendant is entitled to a verdict of acquittal.   Affirmed.

17. That the several facts and circumstances relied upon by the Commonwealth to convict the defendant, must each be proven to be true beyond all reasonable doubt, and if any of them are not so proved it is the duty of the jury to acquit the defendant.   Affirmed.

The indictment charges in one count, that the defendant, Milton Weston, Absalom M. Bowser and others, murdered Obadiah Haymaker, and under the indictment, this defendant could, if the facts warrant, be convicted, whether he be regarded as principal of the first degree, as principal of the second degree, or as·accessory before the fact.   You have been sworn to try the allegations of this indictment so far only as Milton Weston is concerned.

I assume for the purpose of this charge, that you will find that Absalom Bowser did, and Milton Weston did not, inflict the wounds which resulted in the death of Obadiah Haymaker.   Under the capabilities of this indictment, it will be necessary for you to try the allegations as to Absalom Bowser, and to determine his guilt or innocence, and if guilty, ascertain the degree of homicide of which Bowser was guilty.   In passing upon the guilt or innocence of Bowser, you will do it upon your responsibility as jurors, and upon the evidence given in this trial as exclusively as though you had not been told by counsel that Bowser had been tried and sentenced. You must make up your minds upon this, as upon every other question involved, for yourselves.

I now read from the charge of Chief Justice AGNEW.— "At common law, murder is described to be, when a person of sound memory and discretion unlawfully kills any reasonable creature in being, and under the peace of the Commonwealth, with malice aforethought, expressed or implied.   The distinguishing criterion of murder is malice aforethought, but it is not malice in its ordinary understanding alone, a particular ill-will, a spite, or a grudge.   Malice is a legal term, implying ·much more.   It comprehends not only a particular ill-will, but every case where there is a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.   Murder, therefore, at common law embraces cases where no intent to kill existed, but where the state or frame of mind termed malice, in its legal sense, prevailed.

"In Pennsylvania, the legislature, considering that there is

[Weston v. The Commonwealth.]

a manifest difference in the degree of guilt, where a deliberate intention to kill exists, and where none appears, distinguishes murder into two grades: Murder of the first and murder of the second degree; and, provided that the jury before whom any person indicted for murder should be tried, shall, if they find him guilty thereof, ascertain in their verdict whether it be murder of the first or murder of the second degree. By the Act of the 31st of March, 1860, all murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder of the second degree."

Many cases have been decided under this clause, in all of which it has been held that the intention to kill is the essence of the offence, therefore, if an intention to kill exists, it is wilful; if this intention be accompanied by such circumstances as evidence a mind fully conscious of its own purpose and design, it is deliberate; and if sufficient time be afforded to enable the mind fully to frame the design to kill, and to select the instrument, or to frame the plan to carry this design into execution, it is premeditated: The law fixes upon no length of time, necessary to form the intention to kill, but leaves the existence of a fully formed intent as a fact to be determined by the jury, from all the facts and circumstances in evidence.

A learned judge, Judge RUSH, in Commonwealth v. Richard Smith, has said: "It is equally true, both in fact and from experience, that no time is too short for a wicked man to frame in his mind his scheme of murder, and to contrive the means of accomplishing it." But this expression must be qualified lest it mislead. It is true that such is the swiftness of human thought, that no time is so short, in which a wicked man may not form a design to kill, and frame the means of executing his purpose. Yet this suddenness is opposed to premeditation and a jury must be well convinced upon the evidence that there was time to deliberate and premeditate. The law regards, and the jury must find the actual intent, that is to say, the fully formed purpose to kill, with so much time for deliberation and premeditation, as to convince them that this purpose is not the immediate offspring of rashness and impetuous temper, and that the mind has become fully conscious of its own design. If there be time to frame in the mind, fully and consciously, the intention to kill, and to select the weapon or means of death, and to think and know beforehand,

though the time be short, the use to be made of it, there is time to deliberate and to premeditate.

The proof of the intention to kill, and of the disposition of mind constituting murder in the first degree, under the Act of Assembly, lies on the Commonwealth. But this proof need not be express or positive. It may be inferred from the circumstances. If, from all the facts attending the killing, the jury can fully, reasonably and satisfactorily infer the existence of the intention to kill, and the malice of heart with which it was done, they will be warranted in so doing. . . . . . All murder not of the first degree is necessarily of the second degree, and includes all unlawful killing under circumstances of depravity of heart, and a disposition of mind regardless of social duty ; but where no intention to kill exists, or can be reasonably and fully inferred, therefore in all cases of murder, if no intention to kill can be inferred or collected from the circumstances the verdict must be murder in the second degree.

Manslaughter is defined to be the unlawful killing of another without malice expressed or implied, which may be voluntarily in a sudden heat, or involuntarily, but in the commission of an unlawful act. Voluntary manslaughter often so nearly approaches murder, it is necessary to distinguish it clearly. The difference is this : Manslaughter is never attended by legal malice or depravity of heart, that condition or frame of mind before spoken of, exhibiting wickedness of disposition, recklessness of consequences or cruelty, being sometimes a willful act, as the term voluntary denotes. It is necessary that the circumstances should take away every evidence of cool depravity of heart or wanton cruelty. Therefore, to reduce an intentional blow, stroke or wounding, resulting in death, to voluntary manslaughter, there must be sufficient cause of provocation, and a state of rage or passion, without time to cool, placing the prisoner beyond the control of his reason, and suddenly impelling him to the deed. If any of these be wanting, if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder. . . . . . Insulting or scandalous words are not sufficient cause of provocation ; nor are actual indignities to the person of a light and trivial kind. Whenever the act evidences a deadly revenge and not the mere heat of blood; whenever it is the result of a devilish disposition and not merely the frenzy of rage, it is not manslaughter but murder.

" To excuse homicide by the plea of self-defence, it must appear that the slayer had no other possible, or at least probable means of escaping, and that his act was one of necessity.

The act of the slayer must be such as is necessary to protect the person from death or great bodily harm. and must not be entirely disproportioned to the assault made upon him. If the slayer use a deadly weapon, and under such circumstances as the slayer must be aware that death will be likely to ensue, the necessity must be great, and must arise from imminent peril of life, or great bodily injury. If there be nothing in the circumstances indicating to the slayer at the time of his act, that his assailant is about to take his life, or do him great bodily harm, but his object appears to be only to commit an ordinary assault and battery, it will not excuse a man of equal, or nearly equal strength, in taking his assailant's life with a deadly weapon."

The burthen lies on the prisoner, in such a case, of proving that there was an actual necessity for taking life, or a seeming one so reasonably apparent and convincing to the slayer as to lead him to believe he could only defend himself in that way."

"When two or more are to be brought to justice for one and the same felony they are considered in the light of first principals in the first degree, second principals in the second degree, third accessories before the fact, or fourth accessories after the fact, and in either of these characters they will be felons in consideration of law, for he who takes any part in a felony, is in the construction of law a felon, according to the share which he takes in the crime." . . . . . A principal in the first degree at common law is one who is the actual perpetrator of the act. Principals in the second degree, are those who are present, aiding and abetting the commission of the offence. . . . . . "Merely witnessing a crime, without intervention, does not make a person a party to its commission unless his interference was a duty, and his non-interference was one of the conditions of the commission of the crime." "Hence, although a man be present while a felony is committed, if he take no part in, and do not act in concert with those who committed it, he will not be a principal in the second degree, merely because he did not endeavor to prevent the felony or apprehend the felon."

It must appear that it was in his mind to encourage, incite, approve of, or in some manner afford aid or consent to the particular act.

"It is not necessary, however, to prove that the party actually aided in the commission of the offence; if he watched for his companions, in order to prevent surprise, or remained at a convenient distance in order to favor their escape, if necessary, or was in such a situation as to be able readily to come to their assistance, the knowledge of which was calculated to

[Weston *v.* The Commonwealth.]

give additional confidence to his companions, in contemplation of law, he was aiding and abetting."

"But the act must be the result and in execution of the confederacy; and if the crime is committed by a confederate, as collateral to an escape, or if several are out for the purpose of committing a felony, and, upon an alarm, run different ways and one of them maim a pursuer to avoid being taken, the others are not to be considered principals in such act."

"It is not necessary that the crime should be part of the original design; it is enough, if it be one of the incidental probable consequences of the execution of that design, and should appear at the moment to one of the participants to be expedient for the common purpose. Thus, where A and B go out for the purpose of robbing C, and A in pursuance of the plan, and in execution of the robbery, kills C, then B is guilty of murder."

"An accessory before the fact, is one who, though absent at the commission of the felony, procures, counsels or commands another to commit said felony subsequently perpetrated in consequence of such procuring counsel or command. To constitute such an accessory, it is necessary that he should have been absent at the time when the felony was committed, if he was either actually or constructively present, he is, as has been seen, principal. The accessory is liable for all that ensues as incident to the execution of the unlawful act commanded."

"Having stated the law of the crime, we now note the law of the evidence; and first, it may be stated as a general rule, that all homicide is presumed to be malicious, that is murder of some degree, until the contrary appears in evidence. Therefore, the burden of reducing the crime from murder to manslaughter, where it is proved that the prisoner committed the deed, lies on him. He must show all the circumstances of alleviation or excuse upon which he relies to reduce his offence from murder to a milder kind of homicide, unless, indeed, where the facts already in evidence show it. But though the homicide without the circumstances of alleviation or excuse, is presumed to be murder it is not presumed to be murder of the first degree; the presumption against him rises no higher than murder in the second degree, until it is shown by the Commonwealth to be murder in the first degree. It therefore lies on the Commonwealth to satisfy the jury of those facts and circumstances which indicate the deliberate intention to kill, and to prove depravity of heart and conscious purpose, which constitute, as before stated, the crime of murder in the first degree. In deciding upon the case, or upon any material part of it, the jury must find such beyond

[Weston v. The Commonwealth.]

any reasonable doubt arising out of the evidence, which prevents them from coming to a satisfactory conclusion, but this doubt must fairly arise out of the evidence and not be merely fancied or conjured up.  A jury must not raise a mere fanciful or ingenious doubt to escape the consequence of an unpleasant verdict.  It must be an honest doubt, such a difficulty as fairly strikes a conscientious mind and clouds the judgment.  If the mind be fairly satisfied of a fact, on the evidence, as much so as would induce a man of reasonable firmness and judgment to take the fact as true, and to act upon it in a matter of importance to himself, it would be sufficient to rest a verdict upon.  I also quote on this point from the great Chief Justice GIBSON.  "Evidence is sufficient when it excludes disbelief: that is, actual and not technical disbelief, for he who is to pass upon the question, is not at liberty to disbelieve, as a juror, while he believes as a man, it is enough that his conscience is clear."  Or, as another Chief Justice has put it, "The evidence which produces belief in their minds in one capacity, would work the same result in the other. The law says you are the judges of the credibility of the witnesses, and your whole duty in this regard is involved in a correct understanding of what it is to 'judge' of their credibility."

"The presumption of the law is, that every witness, duly sworn or affirmed, speaks the truth until the contrary appears and that must appear from what you have seen or learned here upon the trial.  So it would not be a performance of your duty if you were to disregard the testimony of a witness simply because you have the power to do so.  The rejection of his testimony must be the result of careful reflection and of an honest effort to form a correct judgment upon the point."

"The defendant has produced evidence of his general reputation for peace and good conduct among those who have known him during his past life.  The effect of such evidence is not confined to doubtful cases.  Evidence of good character when proved to exist, is not a mere make-weight thrown in to assist in the production of a result that would happen at all events; but it is positive evidence.  A case may be so made out, that no previous character, however good, can make it doubtful; but there may be cases in which evidence given against a person without character would command credence in which a high character would produce a reasonable doubt, or indeed, actually outweigh the criminating evidence.  Such evidence is in truth 'a fact varying greatly in value according to its nature; varying still more in value according to the proof to which it is opposed,' but it may of itself, by the crea-

tion in your minds of a reasonable doubt of the existence or truthfulness of the criminating.evidence cause you to acquit the defendant."

The nature of the weapon used by an accused may be important to be considered. The deadliness of the weapon tends to indicate the intention with which it is used. I read the language of the Supreme Court in a case where a wife was killed by a musket ball.

" If the killing was not accidental, then malice and a design to kill were to be presumed from the use of the deadly weapon; for the law adopts the common and rational belief that a man intends the usual, immediate and natural consequences of his voluntary act. Human reason will not tolerate the denial that a man who intentionally, not accidentally, fires a musket ball through the body of his wife, and thus inflicts a mortal wound, has a heart fatally bent on mischief, and intends to kill. Whatever, therefore, in this case, tended to prove that the killing was not accidental, contributed also to establish that it was wilful, malicious and with a design to kill." . . . . .

As to the testimony of Hirsh and Keil, you will ascertain whether they were accomplices of the defendant. If they were the law of their credibility is as follows:

" The degree of credit that should be given to an accomplice is a matter exclusively within the province of the jury. It is competent for them to convict on his uncorroborated testimony, but the source of such evidence is so corrupt that it is deemed unsafe to rely upon it alone; and hence it is the practice of courts to admonish the jury of the danger and advise against a conviction on the testimony of an accomplice, unless he is corroborated to some extent, especially as to the guilt of the party he accused."

Now let me assist you in applying these principles and rules to the facts as you, whose duty it is, may find them. You will probably first determine of what crime, if any, Absalom Bowser was guilty. You will probably find that the instrument used, a bayonet, an instrument of warfare, is a deadly weapon, and that the injuries inflicted by him were not accidental. If the injuries so inflicted by Bowser killed Obadiah Haymaker, as we have seen, the law presumes the slayer's offence was murder of the second degree.

Do the facts show that the presumption is erroneous? Was Bowser's offence, if any, manslaughter? Was there such provocation given to Bowser as would warrant rage or passion upon his part? Was he impelled in his action by such passion, without time to cool, placing him beyond control of his reason and suddenly impelling him to the deed? If there was

no provocation, as has been heretofore indicated, or if he was not under the control of passion, or if his passion was solely the result of his own temper and disposition, his offence, if any, was not manslaughter.

Were the injuries inflicted in self-defence? If you find that Bowser used a deadly weapon, in such manner that death was likely to ensue, as we have seen, the necessity must have been great, and must have arisen from imminent, or to him seemingly, imminent peril of life, or of great bodily harm. Had he no other possible, or at least probable means of 'escaping and of avoiding the necessity of imperiling the life of Haymaker?

If there be any other facts in evidence which show that the presumption as to murder of the second degree is erroneous, you will apply them.

If you do not find that Bowser was guilty of manslaughter, or acted in self-defence, you will inquire whether he was guilty of murder of the first degree. If you find that Bowser intentionally, not accidentally, used a deadly weapon upon the body of Haymaker, and inflicted wounds which caused his death, malice and design to kill are, as we have seen, to be presumed from such use of the weapon. Was the killing deliberate and premeditated? As we have seen, if sufficient time be afforded to enable the mind fully to frame the design to kill, and to select the instrument, the act is premeditated. As I recall the testimony of the surgeon, Bowser inflicted three fatal penetrating wounds, and four abrasions slightly penetrating the body. It has been testified that he took the gun and bayonet, which he used, out of the hand of another, and also that he fired in the direction of the deceased, and that the latter received a grave gun-shot wound. If you believe this evidence, you will determine whether these acts afforded him sufficient time to fully frame the design to kill, and to select the instrument with which to execute it, and in connection with the nature and use made of the instrument, whether he did frame such design.

Considerable evidence has been offered, and a great deal has been said as to possession, and right of possession and property, relative to which I may say that in a possible aspect of this case you may utterly disregard it. If you find from the evidence that no attack or appearance of attack was made by the deceased and those acting with him, upon Bowser and the others at the derrick, and that the latter were not put upon the defensive, it was quite immaterial whether Bowser and the others were there in the exercise of right of possession or not, as their acts were not in defence of such rights. If you find that all that Haymaker and those acting with him

[Weston *v.* The Commonwealth.]

did, or gave any indication of doing, was to go and stand upon the pile of boards and remain there, and that those boards were the property of the company with which those men were connected, you will determine the guilt or innocence of Bowser and of the defendant, without reference to questions of possession of property. If that was the state of facts at the time the deceased was wounded, he and those with him were no more than trespassers; though they had no right on the premises, the use of a deadly weapon upon his person was criminal. What is the testimony as to this matter? As I recall it (you will ascertain the facts for yourselves in all questions), the testimony for the Commonwealth is uniform and corroborated by one witness of the defence; that Haymaker and those acting with him came to the neighborhood of the derrick without haste and without the brandishing of pick handles, that there was no, or that the witnesses saw no brandishing of pick handles by those on the board pile, and that no attack or appearance of attack was made by the latter. Of the witnesses for the Commonwealth there was a farmer, a mail boy, and three young men, and possibly others who seem to have had no connection with the claimants of the well. The only diverse testimony that I remember was that of Mr. Mechling, and a young man, who both were at a distance, according to Mr. Mechling, of about one thousand feet. You will determine the facts.

I instruct you further, that the title and possession of this defendant to the well was not as would excuse him, or those with him in taking their defence, the life of an assailant, though the latter might with others have come with the manifested purpose of expelling by force those in possession. Rather than this, he and they would have to submit to dispossession and to seek redress through the law. If you find that Bowser was not guilty of any degree of homicide, you will acquit this defendant. If you find him guilty of any offence under this indictment, you will consider the relation, under the law and the facts, of this defendant to the offence of Bowser. Was the defendant, Weston, present, aiding and abetting (as you have learned, the law interprets these words) in the crime, if any, committed by Bowser? Was he in such a situation as to be readily able to come to Bowser's assistance, if useful?

[As you have seen, in order that you may find this defendant guilty of being present, aiding, and abetting, it is not needful that it should appear that he was actually at hand, that he personally assisted, that he knew beforehand of Bowser's act, or that he consented to it beforehand. It will be sufficient that he was near enough to readily assist in further-

[Weston v. The Commonwealth.]

ing the purpose for which he and those with him were there, and that the killing was an incidental and probable consequence of the execution of that purpose, and that the killing appeared at that moment to Bowser to be expedient for that purpose. What was that purpose? Was it, as I understand, to be the claim on the part of the defendant, to occupy the well, if it could be done without a breach of the peace, and to hold it by using only lawful means, without intent to use a deadly weapon, but merely to employ such weapons for purposes of intimidation?]

Or, was that purpose to dispossess those who at the time were occupying the well, to provide guns, bayonets and ammunition, and to take them upon the premises, and to hold the well, by their use, if necessary? You will determine this question in the light of all the evidence, the providing of guns, of balls and cartridges, and of bayonets, of the loading of the guns with missiles, of the using, as testified, of the guns as clubs against the deceased and others when they approached unarmed, and such other facts as may aid you in your inquiring as to your respective theories on this point.

If you find that this defendant was present, aiding and abetting in, and that the act of Bowser was done in pursuance of the common purpose, and was an incidental and probable consequence of the execution of the purpose for which Bowser was there, this defendant was a principal in the killing by Bowser, though it was not a part of the common purpose.

But even if you so find, it seems to me that this defendant's crime is not necessarily of the same grade as that of Bowser. If you find the facts so to be, and at the same time though this defendant may have brought Bowser there, that Bowser's act was influenced by brutal passion, unsuspected by this defendant, it seems to me, although he could not be guiltless, the law would regard his criminality as possibly of a less grade than that of Bowser.

Did the defendant, though absent at the killing of the deceased, procure counsel, or command the act of Bowser, perpetrated in consequence of such procuring, counsel or command?

The evidence does not give a direct answer to this question, and you must determine it by inference from the evidence. If you can fully, reasonably and satisfactorily find from all the evidence that such was the case you will be warranted in so doing. If you so find, and that the killing ensued in the execution of the unlawful act, procured, counseled, or commanded by this defendant he would be liable therefor.

Counsel have pressed upon your attention on the one hand, considerations touching the defendant, and on the other of

alleged duty to the community and to the law. You will give these and all other considerations their due weight. You cannot fully perform your duty, if you shall consider only the defendant and the consequences to him. In my judgment, you can best discharge it if you will keep constantly before you that your duty is simply to try a question of fact, and to give a true verdict according to the evidence. If you will exclude from your mind every consideration that does not aid you in ascertaining that verdict, you will therein be faithfully performing your obligations to the defendant, to the law, and to yourselves.

The jury returned a verdict of guilty of voluntary manslaughter. A motion in arrest of judgment was made which was overruled, whereupon the defendant was sentenced to pay a fine of six cents and the costs of prosecution, and undergo an imprisonment in the Western Penitentiary for the period of five years.

The defendant took this writ assigning for error the manner of answering the defendant's first point (1st assignment) the answers to the eighth, ninth, eleventh and twelfth points (2d, 3d, 4th and 5th assignments); that portion of the charge above quoted which is enclosed in brackets; (6th assignment); the overruling of the challenges to the jurors, Burns, Tyle, Morris, Weldon, McElhaney and McClelland (7th, 8th, 9th, 10th, 11th and 12th assignments); and the exclusion of the testimony of the witness, Mechlin, as to the advice given by counsel to the defendant (13th assignment.)

*Thos. M. Marshall,* (with him *John S. Robb, Wm. Reardon,* and *C. A. O'Brien,*) for plaintiff in error. The answer of the Court to the 8th point was clearly erroneous, in effect the Court charged that, if the killing was an *incidental probable consequence* of the Weston parties purpose the defendant was guilty. Murder cannot be committed by "incidental probable consequence in a case of this character. It was either the intent of Weston to use arms by way of mischief or for intimidation solely," and the answer does meet the point. There can be no crime without evil intent: Bishop Cr. Law, §§ 286, 289. If Weston the employer of Bowser intended only lawful and legal means in the assertion of the right of possession, he cannot be held responsible if his employee struck a fatal blow; this is the effect of the defendant's ninth point and it should have been affirmed.

It was error to overrule the defendant's challenge to the jurors Burns and others. Bowser had been convicted at the preceding term of murder in the second degree. Weston was to be tried for aiding and abetting in the commission of the

[Weston v. The Commonwealth.]

offence of which Bowser had been convicted; to convict Weston it was necessary to prove that Bowser was guilty of some degree of homicide; thus the evidence against Bowser was essential evidence against Weston, and persons who had made up their minds as to the guilt of the former should not have been permitted to sit in judgment upon the latter: See Staup v. Commonwealth, 24 P. F. S., 461; Allison v. Commonwealth, 3 Out., 32.

The evidence as to the advice given by Weston to his counsel was offered.  1. To rebut the presumption of malice from the possession of firearms.  2. To mitigate the grade of the offence.  The Court rejected these offers apparently on the ground that the adviser was a co-defendant, but the evidence of one who heard the advice given was competent.  In a case for malicious prosecution when the advice of counsel is competent evidence to rebut the presumption of malice, who will deny that a third party may prove the advice?  Whether counsel dead or living, absent or present, competent or disqualified as a witness, it is sufficient to render his advice evidence that at the time of giving the advice he was *disinterested.*  The after indictment could not destroy the effect of the advice.

*W. McCullough,* acting District Attorney, and *W. D. Moore,* for the Commonwealth.—Confederates in a common design of which the offence is a part are all principals, in the ensuing crime, if it be the incidental or probable consequence of the illegal common design: Desty Am. Cr. Law, § 39, and cases cited.  One who sets in motion the physical power of another is responsible for its result, even if he did not contemplate it in kind, yet if it was the ordinary effect of the cause he is responsible, so if he awoke into action an indiscriminate power.  If he gave vague and incautious directions and the person receiving them acted according to what he might have foreseen would have been the understanding, he is responsible: 1 Bishop Cr. Law, § 41; Commonwealth v. Daley, 2 Clark, 361.  An Act otherwise legal may from the manner, place and circumstances of its perpetration become illegal: Commonwealth v. Neills, 2 Br., 553; Rex v. Jackson, 4 Pa. L. J., 156, while a man may use reasonable force to defend his actual possession of his property against one who comes to dispossess him in that event he cannot innocently carry this defense to the extent of killing the aggressor: 1 Bish. Cr. Law, §§ 857, 876; Desty Am. Cr. L., § 127.

Mr. Justice GREEN delivered the opinion of the court, January 4, 1886.

There is no merit whatever in the first assignment of error. The modification of the defendant's eighth point covered by the second assignment was entirely correct. The point limited prisoner's responsibility to a direct aiding or assisting in the killing. The answer merely modified this by extending the responsibility to aiding or abetting in the common purpose of all, providing the killing was in pursuance of, or an incidental probable consequence of such purpose. We see no error in this. If there was a common purpose to kill and the prisoner was present aiding or abetting in that purpose, of course he was liable for the act of one of the party he was aiding in carrying out that purpose. Equally true is it that he would be so liable if the killing was a probable consequence of the common purpose. Thus it is said in 1 Whart. Cr. Law, § 220 (8th ed.): "It is not necessary that the crime should be part of the original design; it is enough if it be one of the incidental probable consequences of the execution of that design and should appear at the moment to one of the participants to be expedient for the common purpose. Thus where A. and B. go out for the purpose of robbing C., and A. in pursuance of the plan, and in execution of the robbery kills C., B. is guilty of murder."

The intent stated in the point, to hold possession by a show of arms for intimidation only, was itself unlawful and draws to itself the consequences of acts done in carrying it into execution.

The fault of the first clause of the defendant's ninth point is that it does not cover all the circumstances which are essential to the validity of its conclusion. The conclusion is absolute that there would be no responsibility of the defendant, a confederate, although the slayer intended his act. The only premise given for the conclusion is that the defendant intended to hold possession by lawful means, and did not intend to use a deadly weapon upon any who might attempt to dispossess him. But the point includes as part of the intent the determination to hold possession by using as much force as was necessary, and the conclusion ignores the effect of an actual use of arms by the whole party including the defendant in holding possession, and therefore omits a circumstance which may be quite material to its validity.

It was doubtless for reasons like this that the learned Judge said the first clause was ambiguous. The last clause of the point is not technically sound, and justifies the remark of the Court. The fourth assignment is not pressed. As to the fifth, it may be said that it is put rather too strongly for an absolute affirmance, but the Court practically affirmed it by referring it to the jury as an expression of views more proper for them than

[Weston v. The Commonwealth.]

for the Court.   The point related to the effect to be attached
to loose declarations.   This of course was for the jury to con-
sider so far as the application of the doctrine was concerned,
and it was turned over to them without denial or qualification.
Properly it should have been somewhat qualified, but the
omission to express the qualification is no ground for reversal
when it gave the defendant the full equivalent of an affirm-
ance.   The sixth assignment is disposed of by the answer to the
second.   We see no error in the part of the charge covered by
this assignment.   Surely if the killing was an incidental and a
probable consequence of the execution of the common purpose,
and the defendant was participating in the acts, which were
being done in the execution of that purpose, he was respon-
sible.   Whether he was so participating was carefully left to .
the jury.

    The seventh to twelfth assignments, both inclusive, cover
the rejection of the defendant's challenges to six of the jurors.
A careful examination of the testimony of the jurors convinces
us that the challenges were properly overruled under the
decision in the case of Allison v. Commonwealth, 3 Out. 17.

    All of the jurors denied that they had formed or expressed
any fixed opinion as to the guilt or innocence of the defendant.
None of them had read or heard the testimony taken on a
former trial, because there had been no former trial of this
defendant.   There had been a preliminary hearing as to the
facts of the occurrence which resulted in the death of Hay-
maker, and there had been a trial of one of the persons
implicated named Bowser.   Some of the jurors had read the
newspaper reports of the hearing, and some had read parts of
the testimony as published in the newspapers, taken on the
trial of Bowser.   No one said he had read the whole of the
testimony actually delivered on the Bowser trial.   Even if a
reading of the whole of the testimony in the Bowser case
would have disqualified the juror, the evidence does not come
up to that test, and therefore was not sufficient as a cause of
challenge.   But it is very evident that Bowser's case and the
defendant's case are not the same.   One might be guilty and
the other innocent.   The testimony in Bowser's case might
disclose little or nothing of the facts necessary to convict
Weston, and therefore an opinion that Bowser was guilty upon
the evidence given to implicate him, would not at all necessi-
tate an opinion as to Weston's guilt.   As every one of the
jurors denied the formation of any fixed opinion as to Weston's
guilt, there was nothing to disqualify any of them under our
decision in Allison's case.   These assignments are not
sustained.

    As to the thirteenth assignment, it is only necessary to say
    1 AMERMAN—18

that if counsel had advised the defendant that he might with impunity do every one of the acts necessary to make out his guilt, the fact of such advice would have been no defence whatever to him. Of course, if he was advised that he might do some of these acts without criminality, it could have no higher effect. Whatever legal rights the defendant might have as to property claimed by him, he could set up and avail himself of, whether he had been advised of them or not. The giving of the advice neither increases nor diminishes his criminality in any degree, and therefore it was irrelevant.

> The judgment is affirmed, and it is ordered that the record be remitted to the Court of Oyer and Terminer of Allegheny County for the purpose of execution.