## Commonwealth *v.* White, Appellant.

*Criminal law—Murder—Charge—Words and phrases—"Scrutinize"—Evidence.*

1. On the trial of an indictment for murder, where three witnesses testify for defendant to establish an alibi and their testimony, consequently, is of the utmost importance to all parties concerned in the case, it is not reversible error for the court to charge the jury to give such testimony careful and close "scrutinizing." The fact that the judge did not so instruct as to all the testimony is immaterial.

2. The several definitions of the word "scrutinize," contain no suggestion of criticism or suspicion.

*Criminal law—Murder—Reputation—Remoteness as to time.*

3. While it is true that evidence of good character of a defendant must relate to a period at or about the time the offense was committed, still, if the evidence for defendant shows good character for four or five years prior to the crime, the Commonwealth, in rebuttal, may show that defendant bore a bad reputation from a period twenty years before the crime continuously down to the date of the crime.

*Criminal law—Murder—Change of venue—Evidence—Discretion of court—Abuse.*

4. An application for a change of venue being within the discretion of the trial court, a refusal to grant such change is not ground for reversal, where there is no evidence of abuse of discretion.

*Criminal law—Murder—Degree—First degree—Evidence.*

5. A conviction of murder of the first degree will be sustained on an indictment for wife murder, where there is evidence that the prisoner was the last person seen with his wife on the day that she disappeared; that he made a number of false and conflicting statements as to her absence; that her body, with marks of violence thereon, was found eight weeks later in the prisoner's barn, which he kept locked; that she was dressed in the same clothes she had on when last seen, and that there were indications that death occurred about the time of her disappearance.

Argued October 3, 1921. Appeal, No 122, Oct. T., 1921, by defendant, from judgment of O. & T. Lawrence Co., March T., 1921, No. 1, on verdict of guilty of mur-

der of the first degree, in case of Commonwealth v. Albert White, alias A. T. White. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Indictment for wife murder. Before EMERY, J.

The opinion of the Supreme Court states the facts.

Verdict of guilty of murder of the first degree, on which sentence was passed. Defendant appealed.

*Errors assigned* were various rulings sufficiently appearing by the opinion of the Supreme Court, quoting record.

*Robert L. Wallace,* for appellant.—If the charge of the court might prejudice the jury against defendant it is ground for reversal: Pannel v. Com., 86 Pa. 268; Turner v. Com., 86 Pa. 54; Com. v. Pipes, 158 Pa. 25; Com. v. Sheffer, 218 Pa. 437.

The evidence as to reputation was too remote: State v. Pettit, 119 Mo. 410.

*William E. Porter* and *George W. Muse,* District Attorney, for appellee.

OPINION BY MR. JUSTICE FRAZER, January 3, 1922:

Defendant, a resident of the City of New Castle, appealed from a conviction of murder of the first degree, following the refusal of the court below to grant a new trial.

The first assignment of error complains of the court's charge in referring to the testimony of three witnesses, called in support of the defense of an alibi, as follows: "It is your duty to take up the testimony of those witnesses, all that they have testified to, and give it careful and close scrutinizing." Defendant contends the use of the word "scrutinizing," under the particular circumstances of the case, had the effect of casting suspicion on the testimony of the witnesses, with the result that it was not believed by the jury. Defendant was

charged with having murdered his wife, whose body was found under a pile of straw on an upper floor of a barn used by defendant as a stable and garage. She was last seen in his company, in the City of New Castle, on December 23, 1920. The theory of the Commonwealth was that he had murdered her in the evening of that day. The defense of an alibi was not fully sustained unless the evidence accounted for defendant's whereabouts during the entire time within which the crime was believed to have been committed. Whether the evidence was sufficient to establish this defense was a doubtful question. If it did, defendant could not have been guilty of the crime charged. The testimony of the witnesses was, consequently, of the utmost importance to all parties concerned in the case, and it was, accordingly, proper for the court to call the jury's attention to that fact. The use of the word "scrutinizing" does not necessarily imply that the evidence should be viewed with suspicion. "Scrutinize," as defined by Webster, means "to inspect or examine closely; to observe carefully and with critical attention." The Standard Dictionary defines it "to examine or observe closely in detail, to investigate minutely," and the only synonym given is "examine." The word is derived from the Latin "scrutor," "scrutare," meaning literally "to search," figuratively "to examine," the English word being apparently the exact equivalent of the Latin figurative meaning. It contains no suggestion of criticism or suspicion. The mere fact that the trial judge did not use the identical word in connection with the testimony of other witnesses is immaterial. In fact it was the duty of the jury to scrutinize all testimony. As stated above, the testimony of these three witnesses was of particular importance because introduced to establish an alibi, which, if proved, would have been a complete defense, notwithstanding other evidence tending to prove guilt. After full consideration of the assignment we are not convinced that the language complained of had the effect attributed to it by defendant.

The second assignment alleges the trial judge erred in permitting the Commonwealth to introduce testimony of the reputation of defendant at a time twenty years previous to the commission of the crime.   The rule undoubtedly is that evidence of good character of a defendant charged with crime must relate to a period at or about the time the offense was committed: Smith v. Hine, 179 Pa. 203; Hopkins v. Tate, 255 Pa. 56.  The question concerns the character of defendant at the time the alleged offense was committed.  The reason is obvious.  Defendant might have borne a good reputation at a particular and remote period of time; if, however, this reputation was not maintained continuously up to the time of the offense it would be of little or no weight in determining his character at such later date.  Conversely a man may bear a bad reputation at an early date in his life and subsequently reform, in which case it would be unfair to judge his present conduct in the light of his remote history.  There are other and practical reasons why a defendant, if he wishes to take advantage of his good character, should be confined to a time not too remote.  To go back into the early history of his life to secure such evidence, if it existed, would be -a comparatively easy matter for him.  Not so with the Commonwealth, however.  To trace the life and habits of the defendant for more than a few years back is usually impracticable and if he were not limited to recent time it would, in most cases, be out of the power of the Commonwealth to contradict his evidence of good character: 29 L. R. A. 154.  These latter reasons, however, do not apply with the same force to evidence offered in rebuttal by the Commonwealth.  Assuming defendant has offered proof of good character at the time the offense was committed, although it is no answer to show bad reputation existing at a remote period of time, there seems to be no logical reason why that fact could not be shown if coupled with proof that the bad character continued at all times down to the date of trial.  While the

question at issue is the reputation of defendant at the latter date, evidence of bad character at that time is assuredly strengthened or increased in weight if coupled with evidence that defendant had borne a similar reputation for a long time and in all the various communities in which he lived.

Standing alone, the evidence objected to would clearly be too remote, had it not been given in connection with the testimony of other witnesses who were acquainted with defendant's reputation down to the date of the trial. The evidence as a whole thus tended to show defendant bore a bad reputation for twenty years before the crime continuously down to the date of the offense with which he was charged. Witnesses offered by defendant testified to his good reputation during the three or four years he lived in New Castle immediately previous to the commission of the offense. Conceding this testimony would not have been rebutted by proof that twenty years previous to that time he bore a bad reputation, it was proper to show he had continuously during the period of twenty years borne a bad reputation. This distinction is recognized in Hopkins v. Tate, supra, where it was said (page 60) : "We think the learned court erred in admitting in evidence testimony to show the plaintiff's bad reputation for honesty in another neighborhood and eleven years prior to the time when the alleged slanderous words were spoken by the defendant for which this action was brought. The court told the jury there was no evidence tending to show that the plaintiff's reputation for honesty was bad at the time or in the place where he lived when the slander was uttered. This distinguishes the case at bar from Parkhurst v. Ketchum, 87 Mass. 406, cited by the court and appellee to sustain the competency of the testimony, where it appeared that the plaintiff's reputation was bad at the date the words were spoken as well as ten years prior thereto. The court recognized this distinction as material, if not controlling, in the opinion, where, in discussing the competency

of such testimony, it is said: 'Its effect would undoubtedly have been much lessened, if not entirely prevented, by proof that when the words were spoken the woman's general reputation was good, though it was bad ten years before.'" Whether, under the particular circumstances, the evidence offered is too remote is largely a matter of discretion of the trial judge: People v. Cord, 157 Cal. 562, 572; Fry v. State, 96 Tenn. 467; Prater v. State, 107 Ala. 26.

The third assignment is to the refusal of the court below to grant an application for change of venue, based on alleged existence of prejudice against defendant in the neighborhood sufficient to prevent a fair trial. The court heard testimony on the application, and almost if not quite a dozen witnesses were called and examined on each side. Of the witnesses for defendant, those who resided in the City of New Castle were generally of opinion a fair and impartial trial could not be obtained. The witnesses for the Commonwealth were called from various parts of the county and were of opinion a fair trial could be had. In stating the reasons for refusing a change of venue the court below in its opinion said: "The court had personal acquaintance with all of the witnesses called in support of the application for change of venue, as well as those called by the Commonwealth, in opposing the application for change of venue. The witnesses for the Commonwealth, by reason of their occupations and opportunities of coming in contact with the masses of the people, showed a greater familiarity with the sentiment and public thought of the community than those called by the defendant. Several of the witnesses for the defendant admitted that the excitement and the prejudice in the minds of the people at the time of the finding of the body of defendant's deceased wife had subsided, and we were justified in concluding from the testimony of all of the witnesses called on this question that the defendant could obtain a fair and impartial trial, and our opinion thus formed re-

mains unchanged." An application for change of venue being within the discretion of the trial court (Com. v. Allen, 135 Pa. 483; Com. v. Cleary, 148 Pa. 26; Com. v. Buccieri, 153 Pa. 535) and there being no evidence of abuse of discretion, the refusal to grant such change is not ground for reversal.

The fourth, fifth and sixth assignments question the sufficiency of the evidence to support a conviction of murder of the first degree. The court below correctly disposes of the matter of these assignments in this language: "The testimony of the Commonwealth showed that the defendant, on the afternoon of December 23d, the day following his [attempted] marriage to Mrs. Longstreet, [in Pittsburgh] drove in his automobile to his residence in Neshannock Avenue in the City of New Castle at about 4 o'clock in the afternoon; that he entered his house, went to his apartment and shortly thereafter drove away accompanied by his wife. It was also proven that about 5:30 o'clock on that afternoon defendant went to the residence of William F. Mitchell, in the City of New Castle, and obtained a key which Mr. Mitchell had been using to get into a barn rented by defendant on a lease from Miss Treser, which barn was located in the First Ward, City of New Castle. The defendant had given this key to Mr. Mitchell for the purpose of having him, Mitchell, tend to his horses during his absence from the City of New Castle. At the time the defendant called at the Mitchell residence for this key the testimony shows that there was a woman in the automobile (which the defendant had left standing in front of the Mitchell residence) when the defendant drove away and defendant said she was his wife. The testimony further shows that within a few days thereafter defendant moved his household effects from his residence in Neshannock Avenue. That on the day he was moving defendant's son-in-law came to his residence, inquired about defendant's wife and was told by defendant that she had lost her mind and that he had sent her to the Warren hospital for the insane. De-

fendant made a number of statements to various people about that time and subsequent thereto as to where his wife was, all of which were contradictory of each other. He stated to Sheriff Joseph H. Boyd that he had sent her, his wife, to Pittsburgh where she was under the care of a physician. Defendant also stated to a number of persons, and had it published in the newspapers, that he had given money to his wife, and that on the day of her disappearance, namely, December 23, 1920, she had boarded a street car in the City of New Castle intending to go to Chicago and that she would remain away for a period of a year or more. Also, defendant had, in connection with his wife's disappearance, told Mrs. Blaine, from whom he rented his rooms in Neshannock Avenue, and where he lived, that his wife had gone to the home of his daughter out in the country. Several of these statements were proven not to be true. Before the said 23d of December, the defendant had purchased a team of horses from Mr. Mitchell and had rented this barn in the First Ward from Miss Treser in which to keep them. The doors of this barn were locked and fastened, the defendant having the keys. On the 17th day of February, 1921, Mrs. Adella Cooper, and Earl Streib, both living in the vicinity of the barn, became suspicious that the body of defendant's wife might be secreted in the Treser barn, and at about 5 o'clock in the evening they entered the barn by throwing up a hook on the inside of one of the doors and upon entering found the body of a woman in the mow covered with hay and straw. This body was afterwards identified as the body of defendant's wife. The dress on the body and other clothing were identified by Mrs. Blaine as having been worn by defendant's deceased wife on the afternoon of December 23d last, when defendant called for her and took her away. No person seems to have seen Mrs. White, defendant's wife, from the time she left her home in the afternoon of December last until her body was found in this barn, leased and wholly under the control of the

defendant. The barn was not occupied by any other person than the defendant. Defendant [attempted to marry] Mrs. Longstreet on December 22d, in Pittsburgh, this being the day preceding [the wife's] disappearance in company of her husband. An examination of the body disclosed the fact that it had been choked and the head beaten with some hard instrument. The post-mortem examination disclosed the cause of death to have been strangulation and concussion of the brain."

To what the court below said may be added that defendant in his application for a license to marry Mrs. Longstreet made affidavit that his wife had died the previous year, which was untrue; and, upon discovery of her body, refused to identify it as that of his wife, although dressed in the clothes he said she wore when he last saw her. Finally the money he claims to have given her was not found on her person. While the evidence against defendant was entirely circumstantial we agree with the court below that it was sufficient, if believed by the jury, to justify the conclusion that he was responsible for his wife's death.

The seventh assignment refers to the instructions given the jury and alleges, as a whole, they were inadequate and prejudicial to defendant in that the court failed to comment on the strong points of the defense and gave undue prominence to testimony adduced on behalf of the Commonwealth. We find no merit in this assignment. The charge was fair and covered every phase of the Commonwealth's case, as well as that of the defense, and counsel for defendant was apparently well satisfied with the instruction, since, in reply to a question by the court whether there were other matters he desired to be covered in the charge, stated there was none. The rights of the defendant were fully protected and we find no reversible error in the record.

The assignments of error are overruled, the judgment is affirmed and the record remitted to the court below for the purpose of execution.