## Commonwealth *v.* Green, Appellant.

138

Argued June 3, 1958; reargued November 10, 1958. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and BOK, JJ.

reargument refused July 2, 1959.

*Edward A. Garabedian,* for appellant.

*Juanita Kidd Stout,* Assistant District Attorney, with her *James N. Lafferty,* First Assistant District Attorney, and *Victor H. Blanc,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, May 8, 1959:

On July 24, 1957, three 15 year old boys—the appellant Green, Edwin Walker and James Crowson,—

made plans to rob a jewelry store located on Germantown Avenue, Philadelphia. However the next morning the boys abandoned their original plans and decided to rob a drug store located on Germantown Avenue, a drug store owned and operated by Jacob Wallfield, a 75 year old man.

Pursuant to their plans the three boys, at approximately 8:45 A.M. on July 25, 1957, entered the drug store. Walker sat on a stool at the soda fountain, Crowson stood near a counter and Green, armed with a double barreled .12 gauge shotgun,[1] stood near Walker. The druggist, Mr. Wallfield, had come from the back to the front of the store and was behind the soda fountain chopping ice when, noticing Green in the rear of the fountain, he ordered Green to get from behind the fountain. Green without further ado shot Mr. Wallfield in the abdomen. Green and the other boys then ran out of the store. No money was taken by them from the store. Mr. Wallfield was later removed to a hospital where he died the same day of the gunshot wound. The gun was found in the backyard of Walker's home under a pile of debris.

The three boys were apprehended on July 27, 1957: orally and in writing they each confessed and described their respective participations in the affair. On August 6, 1957, Green, represented by counsel, entered a plea of not guilty. His counsel later petitioned for a change of venue which was refused. On September 4, 1957 Walker and Crowson, both represented by counsel, entered pleas of guilty to murder generally; at the same time Green, again represented by counsel, entered a plea of guilty to murder generally after withdrawing his original plea of not guilty.

---

[1] The barrel of this gun had been cut off to 18 inches and the stock to 10½ inches. The gun was concealed in a rug container with a red pillow wrapped around the muzzle.

The court below, composed of President Judge OLIVER, Judge MILNER and Judge DAVIS, took testimony to determine the degree of guilt and on September 5, 1957 the court unanimously found all three defendants guilty of murder in the first degree. To determine the appropriate penalty the court then took testimony as to any mitigating circumstances and on September 9, 1957 fixed the penalty for Walker and Crowson at life imprisonment and for Green as death by electrocution.

Green appealed from this sentence alleging, inter alia, as error that, during his sentencing and at the point when the court pronounced the word "death", he fainted and was not consciously present during the pronouncement of the remainder of the sentence. On June 4, 1958 we remanded the record to the court below "for a resentencing of the defendant" and directed that "the record as augmented by a transcript of the resentencing be returned to this court promptly".[2] On June 12, 1958 Green was resentenced, the record remanded to this Court and a reargument heard.

Four questions are raised by appellant: (1) was the denial of a change of venue an abuse of discretion by the court below? (2) did the court below err in admitting into evidence Green's written confession? (3) did the court below err in refusing to permit appellant to withdraw his plea of guilty prior to the resentencing? (4) did the court below abuse its discretion in imposing the death penalty upon appellant? We shall consider severally each question.

Repeatedly we have held that the refusal of a petition for a change of venue is a matter within the sound

---

[2] The reason for remanding the record was because "of issues of fact raised at bar during oral argument of this appeal relative to circumstances alleged to have obtained at the time the defendant was sentenced upon the judgment of guilt of murder in the first degree, and in order not to allow complications to be unnecessarily injected into the case."

discretion of the court below and will not be disturbed on appeal unless it appears that such discretion was abused: *Com. v. Allen,* 135 Pa. 483, 19 A. 957; *Com. v. Buccieri,* 153 Pa. 535, 26 A. 228; *Com. v. March,* 248 Pa. 434, 94 A. 142; *Com. v. White,* 271 Pa. 584, 115 A. 870; *Com. v. Riggs,* 313 Pa. 457, 169 A. 896; *Com. v. Simmons,* 361 Pa. 391, 397, 65 A. 2d 353, cert. den. 338 U. S. 862, 70 S. Ct. 96, rehearing den. 338 U. S. 888, 70 S. Ct. 181 and cases therein cited; *Com. v. Capps,* 382 Pa. 72, 114 A. 2d 338. See also: *U. S. ex rel. Darcy v. Handy,* 130 F. Supp. 270, aff. 224 F. 2d 504, aff. 351 U. S. 454, 76 S. Ct. 965. The instant petition for a change of venue was based upon the publication of certain newspaper articles concerning the homicide, the recent death of another druggist under similar circumstances and certain activity of the Retail Druggists Association of Philadelphia condemning the occurrence of such crimes. The Commonwealth having filed an answer, the court below took testimony and the testimony, very meager, revealed that three Philadelphia newspapers had published news articles concerning the crime at or about the time of its commission, that the Mayor of Philadelphia had appointed a three man commission to study juvenile delinquency without any mention of this particular offense, that the Retail Druggists Association was aroused because of the killing of Mr. Wallfield and a Mr. Viner, both retail druggists, and that the District Attorney, allegedly, stated his disbelief of Green's age. The court below very properly dismissed the petition. When we consider the entire absence of *any* proof whatsoever of bias or prejudice on the part of the three judges who acted as triers of the facts, the appellant pleaded guilty to this felony murder and that appellant utterly failed to offer any proof "that there is a combination against [Green], instigated by influential persons, by reason of which

he [could] not obtain a fair trial"[3] the court below could not have done otherwise than refuse a change of venue. Not only was there no abuse of discretion shown; on the contrary, the court below most properly exercised its discretion in refusing this unsubstantiated request for a change of venue.

Appellant next contends that the court erred in admitting into evidence his written confession. The record demonstrates the complete lack of merit in such contention. When the written confession was introduced during the direct examination of Detective Hammes appellant's counsel made no objection whatsoever. On the other hand, appellant's counsel not only conceded the absence of any duress in securing this confession but emphasized the voluntary nature of the confession so that the court might be impressed by the fact that Green made no effort to hide the crime. The objection now made that Green, a 15 year old boy, was not *specifically* warned that he might incur the death penalty, although he was warned that he was charged with murder and robbery and that anything he said would be used against him, does not render inadmissible a written confession of guilt concededly made voluntarily and truthfully.[4] Cf: *Com. v. Smith,* 374 Pa. 220, 232, 233, 97 A. 2d 25; *Com. v. Cavalier,* 284 Pa. 311, 131 A. 229.

At the time of Green's original arraignment he was represented by counsel; he then entered a plea of not guilty. Approximately a month later, represented by the same counsel, Green withdrew his original plea of not guilty and entered a plea of guilty to murder generally. From that time until the time of Green's

---

[3] Act of March 18, 1875, P. L. 30 §1, 19 PS §551.

[4] Appellant's counsel stated of record "I want to show that this boy didn't try to hide this crime" and acknowledged to the court that his client had made a "frank and open statement".

resentencing, neither in the court below nor in this Court at the time of the original argument, was there any request or suggestion on Green's part that he desired to change once again his plea. At the time of resentencing appellant's counsel petitioned for permission to withdraw a plea of guilty and enter a plea of not guilty; the ground for such request was that he, as counsel, after a conference with Judge MILNER, counsel for Crowson and Walker and an assistant district attorney, "drew the conclusion" that Green's sentence would be no greater than life imprisonment and that he so advised his client. An examination of the record reveals no misapprehension of facts or law on the part of Green or his counsel, no doubt of the appellant's guilt, no defense whatsoever to the homicide and certainly no justifiable reason to submit this cause to a jury at this time. Such tactics have no place in the criminal law. As aptly stated by the Commonwealth, appellant now complains because of his "attorney's mistaken foresight made clear by the cold realities of hindsight."

Finally and most important, Green contends that the court below abused its discretion in imposing the death penalty upon him. The circumstances surrounding this homicide clearly indicate that Green, Walker and Crowson were all guilty of first degree murder and were properly so found by the court. Green argues not with the finding of guilt but rather with the penalty imposed.

Certain events which took place at Green's original sentencing and the resentencing are illuminating. One judge stated he concurred with the sentence only with a "great" and "definite" reluctance indicating some reservation on his part as to the propriety of the penalty. A second judge was so strongly in favor of the imposition of the death penalty that he made a

statement of record addressed to the Board of Pardons opposing any commutation of the sentence by the. Board, characterizing Green as "mercenary and heart-. less" and expressing the opinion that, since there were "frequent killings by boys of 16, 15 and 14 years of age, and even younger", the "protection of society urgently demands that they [such youths] be held fully accountable for their vicious actions and that they realize clearly they will no longer be dealt with as mere delinquents." The third judge, after a recitation of the facts which led to the finding of first degree murder, assigned no other reason why death, rather than life imprisonment, was the appropriate penalty. When Green was resentenced, the third judge then justified the imposition of the death penalty upon the ground that Green was "the most culpable one, the one who was the brutal killer." The second judge then indicated that he considered Green *relatively* more culpable morally and possessed of greater hardness of heart than the other two defendants.

Our scope of review is limited: we simply determine whether the court below in its imposition of the death penalty upon Green abused its discretion.

In *Com. v. Taranow*, 359 Pa. 342, 344, 345, 59 A. 2d 53, this Court, speaking through Mr. Justice (now Chief Justice) JONES, stated: "The Act of 1939, supra, specifically provides that 'In cases of pleas of guilty, the court, where it determines the crime to be murder of the first degree, shall, *at its discretion*, impose sentence of death or imprisonment for life'. (Emphasis supplied). The extent of our function in the premises is merely to review for a possible abuse of the discretion so reposed in the trial court: Commonwealth v. Hough, 358 Pa. 247, 250, 56 A. 2d 84. 'The point for consideration [on appeal] is not whether this Court would have imposed the death penalty but whether the

discretion vested in the court below was judicially exercised, . . .' Commonwealth v. Howell, 338 Pa. 577, 580, 13 A. 2d 521.

"As an examination of the reported cases will reveal, an abuse of discretion in such regard is indeed rarely to be found so long as the established guilt of murder in the first degree has been competently determined and the penalty imposed is in keeping with the alternative prescription of the statute. . . On the other hand, the discretion exercised by a court in fixing the penalty for a conviction of murder in the first degree, founded upon a plea of guilt, is considered reviewable, as the judicial exercise of a legal discretion is ordinarily reviewable; but, to date, there have been only two instances in which the sentence of death fixed by the trial court has been reduced by this court on appeal to life imprisonment: see Commonwealth v. Garramone, 307 Pa. 507, 515, 161 A. 733 (1932); Commonwealth v. Irelan, 341 Pa. 43, 47, 17 A. 2d 897 (1941). And, a reading of those cases should readily persuade of the justice of the action there taken." See: Act of June 16, 1836, P.L. 784, 17 PS §41.

At the time of the commission of this crime Green was under the age of 16, being approximately 15¾ years of age. In Pennsylvania we have followed the common law rule in measuring the capacity of a child to commit a crime. A child under the age of seven years is conclusively presumed incapable of the commission of a crime; a child between the ages of seven and fourteen years is likewise presumed incapable of committing a crime but such presumption is subject to refutation by evidence that the child does possess the criminal capacity; a child over the age of fourteen years is prima facie capable of the commission of a crime: *Com. v. Cavalier*, 284 Pa. 311, 323, 324, 325, 131 A. 229; *Com. v. Zietz*, 364 Pa. 294, 300, 301, 72 A. 2d 282. Measured

by such standard Green *prima facie* possessed the capacity to commit this crime.

The court below having found that the facts and circumstances surrounding this homicide warranted a verdict of guilty of first degree murder, what effect, if any, should have been given by the court below to Green's age and youth in determining the penalty? Of itself, Green's chronological age of 15 years would not justify the imposition of the lesser penalty,[5] but his age is an important factor in determining the appropriateness of the penalty and should impose upon the sentencing court the duty to be ultra vigilant in its inquiry into the makeup of the convicted murderer. That youthful age is an important factor is graphically illustrated by the fact, that so far as our research can ascertain, *no person* under the age of 16 years and only *one person* under the age of 19 years has ever suffered the death penalty in this Commonwealth.[6] Unfortunately from the instant record we are unable to ascertain to what extent, if any, the court below considered

---

[5] *Com. v. Zietz*, supra. Cf: *Com. v. Howells*, 58 Dauph. Co. Rep. 111, 116, 117. "[The] sparing [of] this boy merely on account of his tender years might be of dangerous consequence to the public, by propagating a notion that children might commit such atrocious crimes with impunity": Blackstone's Commentaries, Vol. 4, §24.

[6] Alexander M. Williams, under sentence imposed by the Court of Oyer and Terminer of Delaware County, was executed June 8, 1931 at the age of 18, he having been 17 years of age at the time of the murder. In *Com. v. Cavalier*, supra, a 14 year old boy was convicted by a jury of murder in the first degree with the death penalty attached but his sentence was commuted by the Board of Pardons. In England children as young as 8 years of age have suffered the death penalty: Blackstone's Commentaries, Vol. 4, §24. This Court, by way of dicta in *Com. ex rel. Joseph v. M'Keagy, Supt.*, 1 Ashmead (Pa.) 248, 256, stated: "If the circumstances of a crime committed by an infant above the age of seven years exhibits unequivocal malice and an obvious knowledge of the impropriety of the act he may be convicted even *capitally*". (Emphasis supplied).

148

Green's age as a factor, although we do know that to one judge Green's age reacted against him because it placed him within a class allegedly causing a crime wave. In this case, as in many others, it is often difficult to learn from the record just what factors led the court to invoke upon this 15 year old boy the drastic penalty of death.[7] One factor, of course, was the circumstances surrounding the homicide, yet even such factor induced one of the judges to impose the death penalty only with "great" and "definite" reluctance. The record reveals less about the factors considered and more about the factors not considered by the court below.

No more awesome duty nor solemn obligation comes within the province of a judge than the decision whether penalty of death or life imprisonment shall be imposed upon a convicted first degree murderer. There is no rule that requires proof of mitigating or extenuating circumstances to reduce the penalty from death to that of life imprisonment.[8] The imposition of the death penalty by a judicial tribunal should be made only when it is the *sole* penalty justified both by the criminal act and the criminal himself and then only after a full and exhaustive inquiry into both the criminal act and the criminal himself. Time and again in referring to the duty of juries in fixing the penalty between death and life imprisonment we have insisted that the jury exercise its discretion only after it has considered *all* the evidence, culpatory and exculpatory, incriminating and extenuating, including what manner of man the criminal is and has been: *Com. v. Wooding,* 355 Pa. 555, 557, 50 A. 2d 328; *Com. v. Stabinsky,* 313 Pa. 231, 237,

---

[7] "An Unsolved Problem: Comparative Sentencing Techniques", B. J. George, Jr., Vol. 45, A.B.A. Journal No. 3, pp. 250 et seq. (March 1959).

[8] *Com. v. Hough,* 358 Pa. 247, 251, 56 A. 2d 84.

238, 169 A. 439; *Com. v. Dague,* 302 Pa. 13, 15, 152 A. 839; *Com. v. Bentley,* 287 Pa. 539, 135 A. 310. The same rule binds a court sitting without a jury to determine the penalty for murder of the first degree.

A famous commentator of the law once wrote: "But by the law, as it now stands, and has stood at least ever since the time of Edward the Third, *the capacity of doing ill, or contracting guilt, is not so much measured by years and days as by the strength of the delinquent's understanding and judgment.*"[9] (Emphasis supplied). To what extent, if any, did the court below measure the understanding and judgment of this 15 year old boy? An examination reveals that Green had an I.Q. of 80, a dull-normal classification. Beyond his age, the manner of the crime and his I.Q. rating the court below—unless the record contains grave omissions—knew nothing and made no inquiries to determine the background of this boy or what made him "tick." To the possible argument that Green could have but did not present such evidence, the answer is clear: when a court sits in judgment to determine whether a 15 year old boy who has committed an atrocious crime shall die in the electric chair it is the duty of the court to inquire and exhaust every avenue of information that would inform it of the type of individual represented by that boy. Both the criminal act and the criminal himself must be thoroughly, completely and exhaustively examined before a court can exercise a *sound* discretion in determining the appropriate penalty.

On the record there is no evidence of the background of this boy; his home environment, the economic circumstances under which he was reared, his scholastic record; in short, what was this boy, now a convicted murderer, really like prior to the commission of this

---

[9] Blackstone's Commentaries, Vol. 4, §23.

crime? Of these things the court below was without knowledge and made no inquiry. It is manifest from this record that two factors only led to the imposition of the death penalty—the manner of the murder and the placation of, what at least one judge conceived to be, the public plaint. The court below in determining the appropriate penalty considered the criminal act, but not the criminal himself and in so doing committed an abuse of discretion. That the criminal act was alone considered is readily seen from an examination of the statements of at least two of the three judges: from the fact that Green was the "trigger man" it was concluded that only the death penalty could be imposed. In arriving at this conclusion no consideration was given to the age, the mentality or the background of Green himself.

A reduction of the sentence imposed on Green arises neither from a disinclination against capital punishment nor a complacent attitude toward convicted criminals. The reduction of this sentence is directed because the court below did not use the proper scales in determining the penalty to be imposed. It focused its attention solely upon the criminal act and failed to make inquiry to ascertain whether there was in the background of this dull-normal 15 year old boy any circumstance of extenuation or mitigation. An appropriate exercise of judicial discretion as required by the statute contemplates that the death penalty be imposed where *all* the facts surrounding the criminal act and the criminal actor have been exhaustively considered and where, after such consideration, no other conclusion can be justified than the extermination of the convicted criminal by death. Determination of the appropriate penalty arrived at in any other manner constitutes an abuse of the judicial discretion.

The sentence of death imposed upon Green is vacated. The record is remanded with instructions that

Green be sentenced by the court below to imprisonment for life, in accordance with law.

DISSENTING OPINION BY MR. JUSTICE BELL:

Three 15 year old boys, Green, Walker and Crowson, held up Jacob Wallfield, a 75 year old man, in his drug store on Germantown Avenue. Two of the boys were unarmed. Defendant Green was armed with a double barreled .12 gauge shotgun, which he had cut off and concealed. When Wallfield ordered Green to get away from the fountain, Green, *without provocation or mitigation*, deliberately, ruthlessly, and wantonly shot and killed Wallfield. Two days later the boys were arrested and orally and in writing confessed. Walker and Crowson pleaded guilty. Green pleaded not guilty but subsequently changed his plea to guilty. Walker and Crowson were found guilty of murder of the first degree and sentenced to life imprisonment. Green was found guilty of murder of the first degree and sentenced to death. The majority of this Court have commuted his sentence to life imprisonment.

I strongly disagree with the conclusion reached by the majority and particularly with the reasons given to support its decision.

From time immemorial, a person who shot and killed his victim during a robbery was guilty of murder, and, if there were no strong mitigating circumstances, he was sentenced to death.*

---

* Moreover, in order to protect society and to deter murder— the two factors which are forgotten or ignored by many Judges and social reformers—the law is well settled that when a killing occurs in the perpetration of a felony, even a look-out, or a driver of a get-away car, or a person who was not armed and did not fire the fatal shot, is also guilty of first degree murder and is subject to the death penalty; and this is true even if the victim was killed by a confederate during his escape: *Weston v. Commonwealth*, 111 Pa. 251, 2 A. 191; *Commonwealth v. Biddle*, 200 Pa. 640, 50 A. 262;

There are three basic errors in the majority's opinion, due probably to the truism that heart-touching cases make bad law.

The first basic error of the majority is that they change the law of Pennsylvania—without any prior authority and without any justification—with respect to the test for the imposition of the penalty of death. The second error is that they have failed to carefully examine and realistically analyze the record in this case. The third and most important basic error is that they have *usurped the discretion* which the Legislature vested in the trial Court to fix the penalty, after a plea of guilty and a conviction of murder.

For the *first time* in the history of this Commonwealth, a majority of this Court has today taken the illogical, unjustifiable and I believe illegal position that "the imposition of the death penalty by a judicial tribunal should be made *only* when it is the *sole* penalty justified by the criminal act and the criminal himself . . ." This new and novel principle of law—the majority opinion does not mention or even indicate that it is a change—is unsupported by any prior decision of this Court; it is contrary to a host of prior decisions of this Court; and it is contrary to the statutory law of Pennsylvania.

The majority opinion then says "both the criminal act and the criminal himself must be thoroughly, completely and exhaustively examined* before the Court

---

*Commonwealth v. Micuso,* 273 Pa. 474, 117 A. 211; *Commonwealth v. Robb,* 284 Pa. 99, 130 A. 302; *Commonwealth v. Doris,* 287 Pa. 547, 135 A. 313; *Commonwealth v. Hough,* 358 Pa. 247, 56 A. 2d 84; *Commonwealth v. Lowry,* 374 Pa. 594, 98 A. 2d 733; *Commonwealth v. Bolish,* 381 Pa. 500, 513-514, 113 A. 2d 464.

* One wonders what charge the trial Judge must hereafter make to a jury in a case when death occurs in a robbery. In such cases everyone knows that the defendant is not and under the law cannot be "thoroughly, completely and exhaustively examined."

can exercise a sound discretion in determining the appropriate penalty.*

"On the record there is no evidence of the background of this boy; his home environment, the economic circumstances under which he was reared, his scholastic record; in short, what was this boy, now a convicted murderer, really like* prior to the commission of this crime? Of these things the Court below was without knowledge . . ." As that famous American, Al Smith, was wont to say, "Let's look at the record."

A trial Court, after a plea of guilty to a charge of murder, hears evidence, and then determines the crime and its degree. After determining the crime, it then takes evidence to aid it in imposing the penalty. Counsel for defendant then presents not only all mitigating circumstances and all other evidence favorable to the defendant, but also all the evidence he can conceive of, which, by any possible chance, might influence the Court to give defendant the lightest possible sentence.

Green, who was represented by experienced counsel, testified in his own behalf and gave his reasons to explain his thoughts and actions and to justify a sentence of life imprisonment. Green and his companion bought 50 shells to "settle some misunderstanding with the Tenderloin Gang, which had just begun." He had lived in Philadelphia for 13 years with his mother and father and (18 year old) brother. For the last year he did not have his mother to look after him (she was in Mt. Alto Tuberculosis Sanitorium). Green went to the Daniel Boone School, a disciplinary school for the most serious disciplinary cases; then was sent to Glen Mills School, "A House of Refuge" in Philadelphia for minors under the age of 21 years. It is a reformatory training school for incorrigibles or minors of vicious

---

* What happens to a jury's verdict of death when they never hear or know what the majority say the trial Court must know?

conduct, and minors committed as vagrants, or upon any criminal charge, or convicted of criminal offenses where the Judge of the proper Court deems such commitment proper. After Green got out of Glen Mills, he went to Penn Treaty School until the end of Grade 9B.

Green's counsel then read to the Court what he considered to be favorable excerpts from a psychological report, and a psychiatric report of Green. The psychological report was made at the end of 1955 and read as follows: "I.Q. 80. described as dull-normal intelligence, emotionally insecure in his relations with others. He is ambitious and extrovertous. Comprehension and judgment are weak points in his adjustments, and social mores were not taught by his family."

The psychiatric report of the Juvenile Court which was made on January 11, 1955, by Dr. D. G. Davidson, read: "Boy is essentially normal. He is mentally clear and alert. No unusual traits. Boy is friendly and cooperative, but is not sufficiently impressed. Diagnosis-normal."

Does that record show "Green's background and what he was really like"? Even more important, what, may I ask, does this Court know about this ruthless crime, or about Green that the lower Court did not know. This Court never saw or heard Green or any of the witnesses—all it knows is that Green deliberately shot and killed in cold blood an old man without the slightest provocation or mitigation; and that he was in a disciplinary School and then in Glen Mills; and that an impartial psychologist believed him to be of a dull-normal intelligence and emotionally insecure; and the impartial psychiatrist of the Juvenile Court found him to be normal.

If the three judges who saw and heard all the witnesses in this deliberate cold blooded murder, as well as Green's above mentioned home environment reports

and record, are not in a position to impose a "sound" sentence, how is this Court—which did not see or hear Green or any of the witnesses, and obviously and unquestionably has less knowledge concerning Green than the lower Court possessed—in a position to impose a "sound" sentence? Is it not clear that the most the majority could do, even under their analysis of the record and their novel theory of the law, would be to remand the case for further investigation and possible resentencing by the lower Court? It is not difficult to perceive how devoid of logic, and of justice to the public, the majority's reasoning and conclusions are, or where lies the manifest abuse of discretion?

The Supreme Court of Pennsylvania is not a super Legislative body, nor is it a sentencing Court, nor is it a super Executive, or even a Board of Pardons, although at times it would be equitable and would promote justice if this Court possessed one or all of those powers.

Three conscientious Judges *on two different occasions unanimously* sentenced Green to death. This was not a light or hasty action on their part—it is a real ordeal to have to sentence a criminal to death, and it obviously must be a terrible ordeal for trial Judges (or juries) to sentence a 15 year old boy to death. The Legislature confided to the trial Court and not to us the duty and the discretion to determine the punishment to be inflicted upon Green. The province and the duty of the Supreme Court, under our American System of Government, is neither legislative nor executive. Our province is to interpret and support the Constitution and the Constitutional statutory laws as they are written, and it is not within our province to ignore or change or rewrite them even though sometimes, I repeat, it would do equity or promote Justice.

In *Commonwealth v. Gossard*, 383 Pa. 239, 117 A. 2d 902, the Court, speaking through Chief Justice

STERN, said (pages 242-243): "The Penal Code, §701, provides that 'In cases of pleas of guilty, the court, where it determines the crime to be murder of the first degree, shall, *at its discretion,* impose sentence of death or imprisonment for life.' While the court's determination of the penalty is subject to appellate review *the question is not whether the appellate court would have imposed the same penalty* as did the court below but whether that court *manifestly abused the discretion confided to it* by the statute: Commonwealth v. Howell, 338 Pa. 577, 580, 13 A. 2d 521, 522; Commonwealth v. Taranow, 359 Pa. 342, 344, 59 A. 2d 53, 54; Commonwealth v. Givens, 363 Pa. 141, 69 A. 2d 142, 144; Commonwealth v. Elliott, 371 Pa. 70, 76, 77, 89 A. 2d 782, 785; Commonwealth v. Phillips, 372 Pa. 223, 228, 93 A. 2d 455, 457."

Green's age (15) is the only possible justification for the imposition of a sentence of life imprisonment *by the trial Judges,* but there is no justification for its imposition by this Court! Children over 14 years of age are and for centuries have been held liable for murder; and they have been executed for murder.* The conviction of a boy, William C. Cavalier, 14 years and 5 months old, of murder of the first degree *with sentence of death* was sustained in a learned opinion by Justice, later Chief Justice, SCHAFFER in *Commonwealth v. Cavalier,* 284 Pa. 311, 323 et seq., 131 A. 229.** See to the same effect *Commonwealth v. Zeitz,* 364 Pa. 294, 300, 301, 72 A. 2d 282; Blackstone's Commentaries,

---

* I believe the majority's opinion would have been clearer and stronger if it had said something like this: "We are opposed to the death penalty, especially for young persons. Notwithstanding all authorities to the contrary, henceforth it shall be unlawful for a trial Court to impose the death penalty on any murderer who is under — years of age."

** Cavalier's sentence was subsequently commuted to life imprisonment, not by this Court, but by the Governor.

Book 3, §§22-24; Bishop on Criminal Law, 9th Ed., Vol. 1, §368, pages 260, 261.

Green is not without an adequate remedy, although the majority have overlooked the fact that his remedy is not in this Court. The Constitution—Art. IV, §9— gives to the Governor of Pennsylvania, upon the written recommendation of the three members of the Board of Pardons, the power of clemency.* This Court does not possess under the Constitution, or under statutory or decisional law, or inherently, any power of clemency; and in my judgment we have no right to usurp either the discretion which the Legislature vested in the trial Court, or the power of clemency which is given by the Constitution to the Governor of Pennsylvania.

I would affirm the Judgment and the Sentence.

---

* As against the natural reluctance of every one to impose the death penalty on a boy under 16 years of age, it is high time that Courts, Governors and Pardon Boards, in the imposition or commutation of sentence, should take into consideration, as President Judge OLIVER of the Court below did, the appalling crime wave which has been sweeping our Country, and the almost unbelievable percentage of major crimes which are committed by boys 18 years and under. In the opinion of many experienced persons the death penalty is both wise and necessary for the protection of society and as a deterrent to the crime of murder. It is a fact which is frequently ignored in dealing with dangerous young criminals that 46 out of every 100 arrests for major crimes in Philadelphia in 1957 were of young persons between 13 and 18 years of age (Civic Affairs, May 1958). Moreover, according to the information supplied by the District Attorney of Philadelphia, 55% of all major crimes committed in Philadelphia in 1957—murder, arson, rape, robbery, burglary and assault with intent to kill—were committed by persons under 18 years of age. It must be apparent that youthful dangerous criminals can no longer be treated as juveniles.