Commonwealth *v.* Martin et al., Appellants.

Submitted September 10, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, SPAULDING, CERCONE, and SPAETH, JJ.

*Thomas E. Harting, William C. Haynes, Richard C. Shay,* and *Theodore S. Danforth,* Public Defender, for appellants.

*Michael H. Ranck, James R. Leonard, Jr., Louise G. Herr, George T. Brubaker,* and *Andrew F. Lucarelli,* Assistant District Attorneys, and *D. Richard Eckman,* District Attorney, for Commonwealth, appellee.

OPINION PER CURIAM, December 11, 1973:

The six judges who heard and decided these appeals being equally divided, the judgments of sentence are affirmed.

OPINION BY SPAETH, J., IN SUPPORT OF REVERSAL:

Appellants contend that they were all six illegally sentenced in that as to each of them sentence was imposed without any reference to their individual characteristics, but rather in accordance with a policy agreed upon in advance by the three judges of the court below that any defendant who pleaded guilty to or was convicted of selling heroin should receive a sentence of not less than three nor more than ten years, consecutive on each count or bill if more than one sale were proved.[1]

During the months of April to June, 1972, each of appellants made one or more sales of various quantities of heroin to undercover State police officers. Appellants were arrested and arraigned on July 19, 1972, pursuant to warrants that had been issued on July 17.[2] Each appellant was brought to trial and sentenced separately.

---

[1] Appellant James Evans Keyes was convicted and sentenced on charges of selling cocaine and marijuana as well, but no contention is raised that a pre-established sentencing policy was applied to those offenses.

[2] There is no charge nor any indication that appellants were conspirators. The record suggests, rather, that the arrests of appellants (as well as of others) were part of a round-up of all known heroin dealers in the City of Lancaster.

Harry Karl Martin appeared before The Honorable Wilson BUCHER on September 21, 1972, and pleaded guilty to three sales of heroin. The undercover officers testified before sentencing that the three transactions consisted of sales of ten bags for $80, five for $50, and four for an undetermined price. The transcript of the sentencing hearing consists of fourteen pages.[3]

The recitation of the facts of the sales occupies two pages. Three pages deal with the voluntariness of the guilty plea and waiver of right to trial by jury. There follows a brief summary by defense counsel of appellant's past: that appellant had no prior record; that he had gone to the first semester of college and had to drop out for financial reasons; that he served a year in Viet Nam and received an honorable discharge; and that when he returned home he found that his friends were using heroin. Counsel also said that appellant used heroin himself: "THE COURT: He is not a drug addict? MR. SHAY [defense counsel] : I don't know if he can make that claim or not." The district attorney asserted that appellant was a known supplier and not an addict. He buttressed this with a remark about the expensive type of car appellant drove (although defense counsel had pointed out that appellant held a full-time job at the time of his arrest). Appellant's mother was allowed to enter a plea for mercy. She said that appellant had always been a good boy and recounted the jobs he had held since he was twelve. At 10:00 a.m., the court recessed until 2:00.[4] When court reconvened,

---

[3] Reference to the length of each sentencing hearing is made here because in none of these six cases did the judge request a presentence report. Thus, especially in the cases involving guilty pleas, the information gathered at the sentencing hearing was all the judge had to rely on in deciding the punishment.

[4] Appellants assert in their brief that "during this interim the Judges and District Attorney's office conferred and decided how to deal with all of the alleged heroin sellers. . . ." There is nothing

Judge BUCHER, after stating that he was applying The Drug, Device and Cosmetic Act, Act of September 26, 1961, P. L. 1664, as amended August 24, 1963, §§1, 2, 35 P.S. §780-20(d),[5] imposed sentence: a $2,500 fine and three to ten years imprisonment for each of the three sales, to be served consecutively, *i.e.*, $7,500 and 9 to 30 years.

Appellant Rafael Nieves was tried before The Honorable W. G. Johnstone, Jr., sitting with a jury, and was found guilty on September 25, 1972. At the outset of the trial defense counsel (Mr. Shay again) made a motion for a change of venue: "I feel that the Court has established the maximum sentencing policy and that this Defendant could not get a sentence in relation to the circumstances." The motion was denied; it was again made and denied at the end of the trial.

The transcript of the sentencing hearing covers five typewritten pages. Defense counsel first argued that in two cases the previous week the court had imposed consecutive sentences for each sale; two of the five pages thus are consumed in discussion of whether this was inherently unfair as in effect letting the police run

in the record to support this particular assertion, although, as will appear, the record does demonstrate that appellants were all sentenced in accordance with a pre-established policy agreed upon by the three judges of the court below.

[5] In fact the applicable law was Act of April 14, 1972, P. L. 233, No. 64, 35 P.S. §780-101 *et seq.* (Supp. 1973). *Commonwealth v. Portalatin*, 223 Pa. Superior Ct. 33, 297 A. 2d 144 (1972); *Commonwealth v. Evans*, 222 Pa. Superior Ct. 590, 296 A. 2d 844 (1972). The error is immaterial, however, inasmuch as the sentence imposed is within the limits of The Controlled Substance, Drug, Device and Cosmetic Act, section 13(f)(1) of which provides that for selling heroin the defendant may be "sentenced to imprisonment not exceeding fifteen years, or to pay a fine not exceeding two hundred fifty thousand dollars ($250,000), or both or such larger amount as is sufficient to exhaust the assets utilized in and the profits obtained from the illegal activity." 35 P.S. §780-113(f)(1).

up the sentence. Counsel next spoke about the distinction between an addict who sells to support his habit and a dealer: "MR. SHAY: This man was a user for five years. There seems to be a distinction between a pure user and a sellor [sic]. But the user who sells to support his own habit—. THE COURT: You have no concern about the victims. MR. SHAY: Yes, sir. I think he should not receive an overburdensome sentence. THE COURT: Okay, I will not give him an overburdensome sentence."

The judge then imposed sentence: a $100 fine and three to ten years imprisonment for each of the five sales, to be served consecutively, i.e., $500 and 15 to 50 years.

Appellant Warren Canoles was tried before Judge BUCHER, sitting with a jury, and was found guilty on September 28, 1972. The transcript of the sentencing hearing covers nine pages.

A Detective Henry testified as follows: "DETECTIVE HENRY: Your Honor, I know him or know about him for some time and I do know that he has been pretty badly addicted to heroin. Every bit of information I got on him indicated he was an addict. In fact, I think he had a pretty extreme habit. THE COURT: Does he have any prior record? DETECTIVE HENRY: He was arrested for minor drinking by our department and paid $36.00 fine and cost. We have a notation here that he was arrested by the sheriff in Phoenix, Arizona, March 1972 for transporting marijuana. There is no disposition and we were unable to find a disposition. MR. HARTING [defense counsel]: Your Honor, I could give the information to show what office that came out of in Arizona to show that it has been dismissed in that office. THE COURT: What was the charge? DETECTIVE HENRY: Transporting marijuana. THE COURT: I'm not going to consider that unless it was a conviction. Are you saying, Detective Henry, that this man should be treated in some way other than the others that have

come before this Court for sales? DETECTIVE HENRY: I am only saying, Your Honor, that he was not, in my opinion, a profiteer, to the extent that some of the other pushers have been. I have arrested pushers and the State Police have also that have not even used the drug. THE COURT: He was found guilty here of sale and we treated the others the same way."

There follows a brief discussion between defense counsel and the judge about whether appellant was profiteering from sales of heroin, and whether that made any difference. The judge apparently concluded that it did not: "THE COURT: The legislature says it's serious and they expect the Courts to impose sentences to deter. I haven't heard any reason why we shouldn't give the standard sentence we have been giving this term of court."

Defense counsel reminded the judge that the jury had recommended "treatment" when they returned their verdict: "MR. HARTING: The jury thought he should have something less than the others because they came in with a recommendation of—. THE COURT: They recommended treatment. Mr. Harting, you know that the Court has nothing to do with that. I hope that he gets treatment. MR. HARTING: The only thing I'm saying, you were asking why there should be a differentiation between him and others and I am saying that this is one reason, because the jury said that."

The judge was unimpressed by this appeal and proceeded to impose sentence, first referring to the prior cases: "I am going to sentence just as we have sentenced in the past." He then imposed sentence: a $100 fine and three to ten years imprisonment for each of the three sales, to be served consecutively, i.e., $300 and 9 to 30 years.

Appellant Hector Burgos appeared before The Honorable W. Hensel BROWN on September 29, 1972, and pleaded guilty to charges that he had made two sales

of heroin. Appellant does not speak English very well and answered through an interpreter. The transcript of the sentencing hearing covers two and a half pages. About five lines deal with appellant personally: "MR. HAYNES [defense counsel] : . . . He has a lot of medical problems. He presently has acute venereal disease and a stomach disorder. He has spent a lot of time in the hospitals. He hasn't been able to work." The rest of the hearing concerned the voluntariness of the guilty plea and waiver and a brief description of the charges (two sales, each of four bags of heroin for $40). The judge then imposed sentence: a $1,500 fine and three to ten years imprisonment for each of the sales, to be served consecutively, *i.e.,* $3,000 and 6 to 20 years.

Appellant James Keyes also appeared before Judge BROWN on September 29, 1972. He pleaded guilty to charges that he had made six sales: three sales of heroin, two of cocaine, and one of marijuana.

The transcript of the sentencing hearing covers five pages. It contains an inquiry into the voluntariness of the guilty plea and waiver. Two undercover officers briefly described the sales, after which the following colloquy appears: "TROOPER ROGERS: Actually, he doesn't use these drugs. MR. RANCK: He doesn't even smoke, sir. He is merely a pusher, and has been for some time. TROOPER ECKENRODE: Your Honor, there are no prior record. He has a very lengthy record of other charges. Sixty-two violations. MR. HAYNES [defense counsel] : Your Honor, Mr. Keyes tells me that he is married and has three children. THE COURT: Where are you from? THE DEFENDANT: North Carolina. MR. HAYNES: Your Honor, he hasn't been working since he came up here. He has to undergo an operation. He is going blind. THE COURT: He might make some other people go blind selling this stuff." The judge then imposed sentence: a $500 fine and one to two years imprisonment for the sale of marijuana, the same sentence for the two sales

of cocaine (the transcript is not clear but the judge apparently gave only one sentence for both sales), and $2,500 fine and three to ten years imprisonment for each of the three sales of heroin, to be served consecutively, *i.e.*, $8,500 and 11 to 34 years.

The last of the six appellants to be sentenced was Dale Troop, following a trial before Judge BROWN, sitting with a jury, on January 15, 1973. He was found guilty of a single sale of heroin. The jury deliberated from 9:52 a.m. to 10:15 a.m. The judge stated that he would hear post-trial motions, instructing defense counsel to "[s]tate one good reason" for a new trial or arrest of judgment. When defense counsel replied, "Your Honor, I am not aware of any reason, but the Defendant has asked me to make it," the judge stated, "Your motion is denied at Bar," and instructed the crier to "[c]all [appellant] for sentence." The following, which represents the entire sentencing hearing, ensued: "[THE COURT]: Now, what has been the sentence imposed in other cases? MR. LUCARELLI [the Assistant District Attorney]: Three to ten years. That was the Commonwealth's offer in this case. THE COURT: I don't penalize anybody for going on trial. This is a first offense? MR. STAINTON [defense counsel]: Yes, your Honor, I believe it is. MR. LUCARELLI: Your Honor, I might say, it is the Commonwealth's opinion that this man is not an addict and has been selling these drugs for profit only. MR. STAINTON: I think Mr. Lucarelli is asking the Defendant be punished for going to trial. THE COURT: Others were pushers, too, Mr. Lucarelli, and they entered guilty pleas and even though the jury disbelieved him, and rightfully so, still he had a right— Constitutional right to go to trial. Now, what is the fine that is imposed on these cases? MR. LUCARELLI: There has been varying amounts. One person got a seventy-five hundred dollar fine on three counts— THE COURT: All right. Anything you want to say? MR.

STAINTON: No, your Honor." The judge then imposed sentence: a $2,500 fine and three to ten years imprisonment.

Thus the record demonstrates: That the three judges had agreed in advance that the sentence to be imposed for a sale of heroin should be three to ten years imprisonment plus a fine, without consideration being given to the defendant's individual characteristics, the sentence to be consecutive if more than one sale were proved; and that each of the six appellants was sentenced in accordance with this agreement. From these facts it follows that the sentences were illegal.

It may be granted that at one time it was believed by many that the fairest way to impose sentence was to impose the same sentence on every person convicted of the same crime. Particularly was this so when there was corporal punishment. Until the nineteenth century, persons convicted of crime were not imprisoned. Prisons were places of detention for those awaiting trial or being held for such matters as ransom, heresy, or debt. *See generally* Barnes, *The Contemporary Prison*: *A Menace to Inmate Rehabilitation and the Repression of Crime*, 2 Key Issues, at 11-12 (1965); Leopold, *Imprisonment Has No Future in a Free Society, id.* at 24-26; Weeks, *Treatment*: *Past, Present, and Possible, id.* at 57-59. A person convicted of crime was fined, or whipped, or put in the stocks; or if the crime was one of a number of felonies, he was hung.

Although this system of punishment was uniform in the sense of fitting the punishment to the crime, it achieved uniformity by assuming that within a given crime there were no gradations, at least none of significance. A person was hung whether he stole a little or a lot. Furthermore, the premise of the system was that man was naturally depraved. Crime was equated with sin; and punishment was not to reform the criminal but to terrorize him (and others) into obedience. Thus the

escalation to death was rapid. For the first offender, a fine, the whip, or the stocks were common. "The next time he would pay treble damages, sit for an hour upon the gallows platform with a rope around his neck, and then be carted to the whipping post for thirty stripes. For the third offense, he would be hung. . . . The . . . rationale was clear: Anyone impervious to the fine and the whip, who did not mend his ways after an hour with a noose about him, was uncontrollable and therefore had to be executed." D. Rothman, The Discovery of the Asylum 52 (1971).

Following our Revolution, there was a change in this philosophy. Colonial practices were seen as not only cruel but as self-defeating. Beccaria's *dictum,* that "the severity of punishment of itself emboldens men to commit the very wrong it is supposed to prevent," was accepted. Rothman, *supra* at 59. According to Barnes, *supra,* the "practical birth place" of our present prison system, not only in the United States but in the world, was the Walnut Street Jail, established in Philadelphia in 1790, to be followed by the prison at Auburn, New York, completed in 1819, and the Eastern State Penitentiary in Philadelphia, completed in 1829. By the middle of the nineteenth century, Sir Walter Crofton and his associates had instituted the so-called Irish prison system, designed to rehabilitate inmates and to prepare them for a law-abiding life. This attracted reformers in the United States, and led to the famous Declaration of Principles of 1870 at the Cincinnati Prison Conference, which led to the opening in 1876 of the Elmira Reformatory.

Accompanying and implementing this philosophical and institutional change was the development of the indeterminate sentence. *See generally The Indeterminate Sentence,* The Prison Journal Spring-Summer 1972. The legislature appraises the gravity of the crime, specifying the maximum prison sentence in accordance

with this appraisal—a long maximum sentence for a grave crime, a short one for a minor crime. The court is given the authority in imposing sentence to select any prison sentence within this maximum; the court may also be given the authority to impose a minimum sentence. Thereby the sentencing judge is enabled to fashion his sentence after taking into account a number of factors, as, for example: the gravity of the crime, including a consideration of aggravating or exculpatory circumstances; the possibility of deterring others from committing the crime; the need to protect the community; and the possibility of the criminal's rehabilitation.

Although there has been some criticism of the indeterminate sentence as vesting too much discretion in the sentencing judge, see, e.g., Struggle For Justice—A Report on Crime and Punishment in America Prepared for the American Friends Service Committee (1971), generally it has become the preferred procedure. See: Model Sentencing Act, Art. III (no minimum sentence, and therefore eligibility for immediate parole); Model Penal Code §6.06 (minimum sentences in case of felonies); American Bar Association Standards Relating to Sentencing Alternatives and Procedures, 129 et seq. (1968) (court should have authority to impose minimum sentence but in most cases should not but should leave to parole board decision when prisoner should be released). And see Williams v. New York, 337 U.S. 241, 246-50 (1949).

The indeterminate sentence as a method of ensuring individualized sentences won early recognition in Pennsylvania. The Act of June 19, 1911, P. L. 1055, §6, as amended by the Act of June 29, 1923, P. L. 975, No. 397, §1, and the Act of September 26, 1951, P. L. 1460, §1, 19 P.S. §1057, provides in part: "Whenever any person, convicted in any court of this Commonwealth of any crime punishable by imprisonment in a State peni-

tentiary, shall be sentenced to imprisonment therefor in any penitentiary or other institution of this State, or in any county or municipal institution, the court, instead of pronouncing upon such convict a definite or fixed term of imprisonment, shall pronounce upon such convict a sentence of imprisonment for an indefinite term : Stating in such sentence the minimum and maximum limits thereof; and the maximum limit shall never exceed the maximum time now or hereafter prescribed as a penalty for such offense; and the minimum limit shall never exceed one-half of the maximum sentence prescribed by any court." The legislature reinforced these provisions by further providing that in certain cases the court could suspend sentence and place the defendant on probation. Act of June 19, 1911, P. L. 1055, §1, as amended by the Act of May 7, 1925, P. L. 554, No. 297, §1, 19 P.S. §1051. Still further provision for individualized sentences was made by the Act of December 22, 1965, P. L. 1187, §1, 19 P.S. §890, providing that "[i]n all cases where the statutory maximum sentence is for two years or more," a presentence investigation and report "shall" be made to the court "unless the court otherwise directs." Subsection (d) of the statute specifies that the information to be included in the report shall be with respect to the defendant's "prior criminal record . . . , characteristics, his financial condition and the circumstances affecting his behavior as may be helpful in imposing sentence or in granting probation. . . ."

The sentences imposed in the present cases were in violation of these manifold provisions and represented a repudiation by the sentencing judges of the legislature's requirement that every sentence must be an individualized one. In none of the cases was a presentence investigation and report made to the court, although in none of the cases did the sentencing judge direct that one should not be made; and although in form each of

the sentences was an indeterminate sentence, in fact, as the record makes plain, none was. The essence of the indeterminate sentence, as both the history and the statutes discussed above show, is that the sentence is formulated only after consideration of the defendant's individual characteristics. Here the sentencing judges agreed in advance what the sentences should be, and in imposing the sentences they followed the agreement to the letter.

The court below did not even achieve its purpose of uniform, or "standard", sentencing. As both the police and defense counsel observed during the sentencing hearings, some defendants who sell narcotics are not themselves addicts but sell for profit, while others sell to "feed their habits." There is nothing uniform about treating these two types of seller as though they were identical. Nor is the observation by one of the sentencing judges to defense counsel—"You have no concern about the victims"—in point. The observation only raises the question, "Who were the victims?" An addict who feeds his habit by selling to another addict is not committing a crime uniform with, or equal in gravity to, the crime of a pusher selling for profit to an unaddicted school child. Indeed, so far as can be determined from the record, what the court below achieved was not uniformity but gross disparity. For example: Appellant Troop may have been a pusher for profit; he received a fine of $2,500 and three to ten years. According to the District Attorney, appellant Martin was a pusher for profit; he received a fine of $7,500 and nine to thirty years. According to Detective Henry, appellant Canoles "had a pretty extreme habit"; "he was not, in my opinion, a profiteer, to the extent that some of the other pushers have been." The detective had known Canoles "for some time." The jury evidently agreed with the detective's appraisal of Canoles, returning with their verdict a recommendation for "treat-

ment." The sentence, however, was a fine of $300 and nine to thirty years (except for the fine, the same sentence as Martin's). The most severe sentence was imposed on appellant Nieves: a fine of $500 and fifteen to fifty years. According to defense counsel, Nieves "was a user for five years." Whether he was or not cannot be determined; the sentencing judge regarded the point as unimportant.

"[The Superior Court] may not increase (although it may reverse) any sentence upon any indictment. . . ." Act of June 24, 1895, P. L. 212, §8, para. 8 as amended June 3, 1971, P. L. 118, No. 6, §1 (§509(a)(33)), 17 P.S. §192 (Supp. 1973). In the ordinary case, this power to reverse will not be exercised, the sentence imposed being regarded as a matter within the discretion of the sentencing judge (although even here there may be reversal if the judge's exercise of his discretion has resulted in a sentence "so manifestly excessive as to constitute too severe a punishment": *Commonwealth v. Wrona*, 442 Pa. 201, 206, 275 A. 2d 78, 81 (1971) ; *Commonwealth v. Bilinski*, 190 Pa. Superior Ct. 401, 154 A. 2d 322 (1959)). Where, however, there is unmistakable error of law, as for example where the sentence exceeds the statutorily prescribed limits, *Commonwealth v. Wrona, supra,* there will be no hesitancy in reversing. Thus in *Commonwealth v. Portalatin,* 223 Pa. Superior Ct. 33, 297 A. 2d 144 (1972), this court speaking through Judge JACOBS reduced a sentence mistakenly based on a repealed statute, without remanding the matter to the court below. Concurring, Judge HOFFMAN observed, collecting cases, that the more usual procedure has been to vacate the sentence and to remand the case for resentencing. *Id.* at 40 n.1, 297 A. 2d at 148 n.1. *And see Commonwealth ex rel. Tiscio v. Burke,* 173 Pa. Superior Ct. 350, 98 A. 2d 760 (1953).

196

In the present cases, in ignoring the legislature's requirement that the sentences be individualized, the court below committed error of law as unmistakable as though the sentences had been imposed under a repealed statute or for a term longer than authorized.

In *Commonwealth v. Green*, 396 Pa. 137, 149, 151 A. 2d 241, 247 (1959), the court said: "Both the criminal act and the criminal himself must be thoroughly, completely and exhaustively examined before a court can exercise a *sound* discretion in determining the appropriate penalty." (Emphasis in original.)[6] In refusing even to inquire about, much less to consider, appellants' individual characteristics, the court ignored its responsibility to "exercise a *sound* discretion in determining the appropriate penalty."

The sentences should be vacated and the cases remanded for resentencing under The Controlled Substance, Drug, Device and Cosmetic Act of 1972.

HOFFMAN and CERCONE, JJ., concur.

---

[6] In *Green* the court reduced a sentence of death to life imprisonment. There is no reason, however, to confine to death cases the court's requirement that the sentencing judge exercise "a *sound* discretion."