THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* REYNALDO RODRÍGUEZ HERNÁNDEZ, Defendant and Appellant.

Nos. CR-62-241,    Decided November 5, 1964.
CR-62-242,
CR-62-243.

*Pablo Cancio,* counsel designated by the Supreme Court on appeal to give legal aid to defendant. *J. B. Fernández Badillo, Solicitor General,* and *J. F. Rodríguez Rivera, Assistant Solicitor General,* for The People.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

Early in the morning of May 25, 1961, the commercial establishment of Herminia Colón Muñiz, situated in the ward of Don Alonso, of Utuado, was burglarized. The body of laborer Narciso Vélez Santiago, who had died as a result of wounds produced by revolver bullets, was found in front of that establishment.

In a three-count information the district attorney charged appellant with being the author of the burglary, of the murder of Narciso Vélez, and of an offense of carrying prohibited weapons. A trial having been held by the court after defendant waived trial by jury, he was found guilty of the three offenses and sentenced to life imprisonment in the case of murder in the first degree, to serve from 7 to 15 years' imprisonment in the penitentiary in the case of burglary in the first degree, and from 2 to 5 years' imprisonment in the penitentiary in the case for carrying prohibited weapons, the last two to be served concurrently with that of life imprisonment.

Feeling aggrieved, defendant appealed. Since the penalties are of such severe nature as life imprisonment, we designated Mr. Pablo Cancio as counsel to represent him before this Court and to render him the necessary legal assistance so that he could fully exercise his right of appeal. The said attorney has faithfully carried out his commitment, and in a very elaborate brief he assigns the commission of two errors committed by the trial court, the first of which is as follows:

"The Superior Court of Puerto Rico, Arecibo Part, committed error of law in finding defendant guilty and convicting him of the offenses of murder in the first degree and burglary in the first degree, on the basis of the testimony of an accomplice such as Pedro Cintrón Adorno, without there being in the case

any evidence tending to connect the defendant with the commission of those offenses, that is, without the accomplice's testimony having been duly corroborated."

In order to decide the questions raised in this assignment of error, we must determine (1) whether witness Pedro Cintrón Adorno was an accomplice in the commission of the offense of burglary in the first degree; (2) whether the witness was likewise an accomplice in the commission of the offense of murder in the first degree; and (3) should it be decided that the witness was such accomplice, whether his testimony was corroborated by independent evidence tending to connect defendant-appellant with the commission of both offenses.

In order to do so, it is necessary to sum up the evidence.

The presumptive accomplice, Pedro Cintrón Adorno, testified on direct examination, according to the correct summary of his testimony made by appellant in his brief, the following:

"On direct examination he testified that on or about May 24, 1961, he lived in Bayamón and was engaged in a transportation service for which he owned a hard-top Chevrolet Bel-Air automobile. That as operator of that automobile he rendered service on the night of May 24 to defendant Reynaldo Rodríguez Hernández. That that night the witness was returning from the Waterfront after taking a sailor to Stop 11, and when the red light at Stop 18 went on the defendant ordered him to stop and he did. That the defendant asked him to take him to Jayuya, that he was going to pay him $20, and the witness told him that he could not because his automobile had one seat removed and if there were many people he could not carry them, to which defendant answered that he was the only one, and the witness then agreed to take him to Jayuya. That it was about 7:00 p.m. and that he did not know the defendant nor had spoken with him before. That defendant then got in the automobile and they reached a garage at the Buchanan intersection, 'and there we took gasoline and a quart of oil, which I did not need but which I carry extra in every car I have.'

That the gasoline was expended by a person 'named Wilfredo, known as Pedro.' That defendant paid $4.15 for the gasoline and the oil; that at that moment defendant was seated in the front seat 'because the back seat was missing.' That defendant was wearing a hat 'of those called *gatos*' and civilian clothes. That after filling the tank with gasoline defendant said to him, 'I'm going to see a girl who works as a housekeeper in a house in Las Lomas,' and the witness then drove to Las Lomas, and afterward, when the defendant said to him that it was late already, he proceeded on the road to Jayuya. That on the way to Jayuya the witness became sleepy and then went to a cafeteria in Manatí. That a girl and a boy waited on them in the cafeteria, and there was a dark man at the cash register. That it must have been between 9:30 and 10:00 p.m. That in addition to coffee they were served *mallorca* and cake. That the witness paid for what they consumed. That after leaving the cafeteria they drove along the road to Ciales and stopped several times because the witness was feeling bad. That in the ward of Don Alonso, of Utuado, there was an establishment on the right-hand side, a store. That the defendant then said to him: 'Stop here, I am going to pull a job here.' That the witness then said to him that he did not dare, that that was not a good thing, that he was doing something wrong, and the defendant then said to him that he was paying him money and that he had to do what he was told to. That then the witness stopped about one-half hectometer from the place of the establishment. The defendant got out of the car. That the defendant, when he hired him in the metropolitan zone, was carrying a paper bag. That at that moment he did not know what defendant was carrying in the bag. That when defendant got out of the car, he carried the bundle. That he did not know either at that moment what defendant was carrying in the bundle. That after defendant got out, the witness lay on the seat of the car because he was feeling sick. That defendant walked over to the store. That that 'must have been quite early, but could not tell the exact hour because he did not carry a watch.' When the district attorney asked him if it could have been between four and four thirty in the morning, he answered 'More or less.' That the witness then saw the flash of a light move down, like a flashlight. That that light moved behind

the car and as far as the place of the business. That then, as it reached the shadow with the light, he heard a shot and when he got up in surprise he saw two flashes from a firearm. That defendant fired those shots, aimed at the walking shadow. That then the defendant came running; that the witness was setting the gears in neutral since otherwise the car would not start, and the defendant asked him 'Are you going to leave me?' and got in the car. That when defendant arrived he was carrying the same bag with him and the revolver. That when he got in the car the defendant loaded the revolver with bullets from a small box. That afterwards, about one-half kilometer from the store, a tire of the car blew out, and he was so nervous that he kept going with the exploded tire and the car zigzagged. That then he stopped and replaced it with the spare tire, and put the deflated one in the trunk. That when the defendant got in the car in front of the business in the ward of Don Alonso, the witness asked him 'Have you killed someone?' and the defendant answered 'Some shots that I fired, keep going, I'll take care of the rest.' That as they came out of the Ciales road at the intersection of the military road where there is a 'Stop' sign, the police stopped them. That the police asked him for his license and started to search the car. That they took out from the car a paper bag where they found some gloves, a flashlight, and a revolver with bullets. That that was the same bag which defendant was carrying when he got in the car and when he headed for the store. That the police found that bag under the seat where defendant was seated. That the police also found under the seat a screwdriver and a crowbar. That the police also seized the box of bullets. That then the police put the defendant and the witness in the patrol car and took them to the office of the district attorney of Arecibo. At the request of the district attorney, the court admitted in evidence a photograph of the witness' automobile as exhibit 2 of The People, and the box of bullets, the revolver, the crowbar, the gloves, and the screwdriver as exhibits 3, 4, 5, 6 and 7 of The People, respectively. At the close of the direct examination of this witness the district attorney, at the request of the defense, delivered to the latter a copy of the sworn statement given by the witness to the district attorney prior to the trial." (Brief for appellant, pp. 3–6.)

On cross-examination he testified that prior to the day of the trial he had given a sworn statement before district attorney Efraín Ruiz; that when the defendant got in his car he was carrying a paper bag, a bundle of about 25 pounds, but that he did not know what it contained; that the defendant did not tell him the purpose of his trip to Jayuya. When confronted with the sworn statement given before the district attorney, the defense asked him why he had said in that statement "We went around Jayuya. We went to town. My companion was looking for a place to commit burglary and also that he had to do some job." The witness answered that he said that to him on the way and later at the place; that "that was on the way when we arrived at the place where he was going to commit the burglary." He testified that he saw what the defendant was carrying in the bag on the way between the place where the burglary was to be committed and the place where he stopped his car; that when the defendant returned from the store after firing he was carrying the revolver in his hand; that the defendant did not place any packages on the seat where he sat; that he saw what was in the trunk of the car, a box of cigars, bottles of rum and anisette; that the defendant told him that he had brought that when the trunk was opened in order to take out the spare tire; that the defendant placed that box on a hill; that he did not know at whom the defendant fired, but that he did know that he fired at a shadow going by, and that the shadow walked like the figure of a person.

He testified further that in saying in the sworn statement that he opened the trunk when defendant returned to the car after the shooting, he meant to say that he opened the trunk referring to the lock because it had no key, but that he did not open the trunk by lifting the top; that the defendant went to the establishment and returned to the car bringing with him the crowbar and the screwdriver,

and threw them under the seat "and went back, and when he went back he heard the shots"; that he saw the other two shots through the glass on the back of the car; that possibly he made a mistake in testifying before the district attorney that he saw the defendant carrying to the car the box with the merchandise; that it is true that when the defendant hired him to take him to Jayuya he said to him that he, the defendant, was going to do a small job, but that he did not know what kind of small job the defendant was going to do. In a part of the cross-examination he answered:

"Q. Did you know that he was going to commit burglary?
A. When he told me, yes.
Q. Did you wait for him?
A. Yes, sir. Not at the place where he committed the act, but I moved farther ahead because I was in such a condition that I could not do anything well.
Q. Did you know that he was going to commit burglary?
A. Yes, sir.
Q. And you waited for him there?
A. I waited for him farther ahead.
Q. And when he brought the stolen merchandise, where did he put it?
A. He put it in the car. It was found in the car. I saw it in the car when I went to mount the tire, and when the police seized it, and when it was brought here. I saw the merchandise on those three occasions."

The other evidence presented at the trial consisted of the testimonies summed up below:

*Dr. José A. Castro* testified that on May 25 or 26, 1961, by order of District Attorney Efraín Ruiz he performed the autopsy on the body of Narciso Vélez Santiago. He presented a bullet wound with orifice of entry at the level of the third intercostal space and orifice of exit at the level of the tenth intercostal space in the back. The bullet perforated the lung and the aorta. The wound was mortal. The

cause of the death was a shock or cardio-vascular collapse due to the massive hemorrhage produced by the perforation of the aorta and segment of the left lung. The body also presented another orifice of entry of a bullet which lodged at two centimeters from the navel. He removed that bullet, marked it with orange pencil and sent it to the district attorney. He identified the bullet which was marred on one side.

*Herminia Colón* testified that she had a business in the ward of Don Alonso, of Utuado, on the road from Utuado to Florida; in the evening of May 24 she closed the business, a door with a crossbar on the inside and with a lock and padlock on the outside. The business has two front doors. Around four in the morning of May 24 going on 25 Martín Rubert and Heraclio Andújar went to her house to call her. She went to her business and found one door ajar and the padlock which had been forced open on the ground; that on the side of the road, at about 11 feet, was the body of Narciso Vélez; she found some boxes of rum, salami and chiclets and other things at the entrance, by the side of the door. She had left that merchandise under the counter, on the cupboards, and in the back room; she did not instruct anyone to move that merchandise from the place where she had left it. She noticed that nothing was missing in her store, that what they intended to take was all there. She also testified that the body of Narciso Vélez had a machete and a file in his hands, and by his side was a flashlight which was out.

*Wilfredo Cuadra López* testified that in the evening of May 24 he was on duty at a filling station in Buchanan, and that that night between seven and seven thirty he sold gasoline and oil to Pedro Cintrón who came there in the company of defendant. The latter paid $4.15, the amount of the sale. Then they left. The following night he saw defendant again when the detective took him there; he knew

Pedro Cintrón by sight, but he did not know the defendant nor had seen him before; that when the detective took the defendant to his presence, he could not recognize him on seeing him without a hat, but he did recognize him when they put his hat on.

*Benjamín Rivera Candelaria* testified that he is a farmer and chauffeur and was engaged in the transportation of laborers from the ward of Don Alonso to Caonillas; that among the laborers whom he transported was the deceased, Narciso Vélez Santiago, and he picked him up in front of the store of Herminia Colón on the road from Utuado to Florida; that on the morning of May 24 going on 25 he noticed a vehicle which was parked about 40 to 50 feet from the store of Doña Herminia; it was a white and red 1957 Chevrolet Bel-Air automobile, the lights of which were out; that he did not pick up laborer Narciso Vélez because when he passed in front of the store he was not there; and when he returned from Caonillas about five minutes later he saw in front of the store two of the laborers whom he used to transport and Narciso Vélez lying on the pavement; that the automobile which he had seen standing near the store was not there any more; that the two persons whom he saw there were Martín Rubert and Heraclio Andújar; that one of the parts of the door of the store was open; that Narciso Vélez was dead; he had a blood stain on the nose and other blood stains on the abdomen. He also testified that he passed Miguel Girona when he left Caonillas about one-half kilometer from Doña Herminia's store; that Girona was at that time a chauffeur and is now a policeman; that he did not speak with Girona when they passed each other.

*Miguel Girona* testified, briefly, that on May 24 he was engaged in the transportation of laborers from the Lago de Caonillas, of Utuado, to Barceloneta, and that around four or four twenty in the morning he travelled along the

route of Don Alonso in the direction of Utuado; that in the morning of May 24 going on 25, about 75 meters from the store of Doña Herminia, he went past a white and black 1957 Bel-Air automobile which was coming in the opposite direction; that that automobile came to a full stop on the walk of the road with the headlights on, and when the witness went past it the vehicle proceeded on its way; that about one minute later he arrived at the front of Doña Herminia's store where he saw Narciso Vélez lying to one side, bleeding from the back; that at that moment he did not see any other person there; that since the witness was alone, he went to fetch someone to come and see what had happened; that he proceeded to Utuado, then went back to Florida; that when he returned to Florida, the sergeant was waiting for him; that when he returned from Caonillas he passed again in front of the store and there were people there already; that he told Benjamín Guerra and Heraclio that he had seen him, but that he did not get out because he was alone and was going to fetch one of them; that then he proceeded to Barceloneta in order to pick up some laborers and see whether he could see again the Chevrolet which he had seen before arriving at the store.

*Carmelo Méndez Rodríguez*, police sergeant stationed in Arecibo, testified that he intervened in the investigation of this case, his intervention consisted of driving the defendant in a car to a place in the ward of Pugnado where he allegedly slept the previous night; that as he reached highway 643 which runs through the ward of Pugnado to Manatí, the defendant saw a "Pugnado" sign and he said to him "That's the sign"; that they drove about four kilometers on the road to the ward of Pugnado until the defendant pointed to the place where he had slept; that there were no signs of a person having slept there; that he looked for a piece of cardboard where defendant allegedly slept and did not find it; that the defendant told him that while he was

walking along the road leading from Vega Baja to Morovis, he signalled an automobile to stop and it gave him a lift; that the defendant did not describe that automobile nor mention the person who was operating it.

*Martín Rubert Rivera* testified that around 4:00 a.m. he headed for Doña Herminia's store on his way to work; that he saw the store open; that he called the owner and she did not answer; that then he saw Narciso Vélez on the sidewalk of the road bleeding from the nose; that since he got scared on seeing the dead body, he kept going where Heraclio Andújar was coming and said to him "Come here, Narciso is here on the ground, it seems that he received a blow"; that he and Heraclio went to fetch a nephew who lives back of the store.

*Heraclio Andújar* testified that he lives in the ward of Don Alonso, of Utuado, and knew Narciso Vélez. He knows that Narciso slept in his brother's house and around four in the morning he saw him dead in front of Doña Herminia's store.

*Félix López Rodríguez* testified that he is a Commonwealth policeman rendering services in Arecibo in the patrol covering the route from Arecibo to Vega Alta; that about 10 minutes to six in the morning of May 24 going on 25, 1961, he and his colleague, policeman Héctor Salazar, received a radio message "that a beige and red 1957 Chevrolet Bel-Air car was coming out of highway No. 2, from Ciales to highway No. 2." They stopped the car as it came out of the Ciales road; that that car did not stop at a "Stop" sign; that when the defendant, who was riding in the seat by the side of the chauffeur, got out, he saw a revolver and seized it; that they knew by the message that someone had been killed; that the revolver was under defendant's seat, and its handle was made of black pasteboard; it was loaded with five bullets; he also seized a box with 36 bullets and one bullet cartridge, some gloves and a

flashlight; "that that was in a small bag" next to defendant under the seat; they also seized a crowbar and a screwdriver; that he examined the trunk of the car in which there was a deflated spare tire; that the other policeman found the crowbar and the screwdriver under the chauffeur's seat where the chauffeur puts his feet; that he asked defendant whose objects those were and he answered that he did not know.

*Camilo Arcelay Rivera* testified that he has been a ballistics expert of the laboratory of the Puerto Rico Police for more than eight years; that in May or June 1961 he made studies of the revolver and bullet presented in evidence; that he made several test discharges with that revolver using bullets of those which were in the box sent to him by the district attorney, and that they were identical with those used when they discharged the firearm, that is, the same make, the same caliber, and the same model; that the general characteristic of the bullet submitted for study and the general characteristic of the bullets obtained in the test discharges were identical; that he "refers to the striation and land twist and to the width of the stria and of the land"; that the bullet submitted for study has a "shaving"; that that "shaving" is produced when the barrel of the firearm "is not correctly aligned with the cylinder of the weapon, that is, that the bullet does not fit correctly into the center of the barrel; then when it passes to the barrel a great part of the amount of lead is scraped off producing that shaving"; that a similar shaving was produced in the corresponding test bullets used by him; that the revolver which discharged the bullet submitted for study has the defect mentioned and which produces the shaving; that he examined the cartridge submitted by the district attorney and compared it in the microscope with the cartridges of the test bullets discharged, and concluded that that cartridge was discharged by the revolver presented in evidence. On

cross-examination the witness testified that he could not ascertain that the bullet submitted for examination was discharged by the revolver, but that he can say that the revolver which discharged that bullet has the same defect as the revolver presented in evidence; that in constructing the barrel of a firearm a piece is originally used to make the orifice from one end to the other according to the caliber desired, and also several instruments for smoothing the barrel, many microscopic characteristics are produced such as those which are engraved in the bullets when passing through the barrel; that a set of characteristics are studies in the bullet submitted for study and in the test bullets; that when discharges are made with defective firearms such as that presented in evidence, many accidental characteristics are produced which alter the individual characteristics of the bullet, "and once those individual characteristics of the bullet are altered, which must necessarily be three-fourths, it cannot be concluded whether it was discharged or not. In this case it has the same general characteristics; possibly there may be some individual characteristics, but not sufficient to say definitely that it was discharged by that firearm." Then even under those conditions the bullet submitted for study had some individual characteristics similar to that of the test bullets.

■■ We agree that witness Pedro Cintrón Adorno was an accomplice of defendant in the commission of the offense of burglary in the first degree. In *People* v. *Montalvo*, 83 P.R.R. 700 (1961), we said at p. 703: "Regarding the necessity for corroborative evidence, we have said that an accomplice is one who wilfully and knowingly—without there being coercion—'voluntarily and with intent, somehow joins in the commission of a crime, being therefore liable to prosecution for the same offense.' In other words, it is essential that the accomplice be prosecuted for the same offense as the person accused. *People* v. *Adorno*, 81 P.R.R. 504 (1959)

(bribery); *People* v. *De Jesús*, 73 P.R.R. 699, 708 (1952) (*bolita*); *People* v. *Rosado*, 72 P.R.R. 773 (1951) (crime against nature); *People* v. *Collazo*, 38 P.R.R. 891 (1928) (corruption of minors); *People* v. *Millán*, 35 P.R.R. 817, 826 (1926) (rape)."

■ At least after they left Jayuya along the road leading to the ward of Don Alonso, of Utuado, witness Cintrón Adorno, operator of the vehicle, knew that his companion intended to commit burglary. Yet, he drove him to the establishment of Herminia Colón without having been threatened or coerced by defendant, and then waited for him near that place until defendant's return after committing the burglary in order to proceed on the trip in his company, as he did until they were detained by the police. That witness aided the defendant in the commission of burglary, since it is unquestionable that he helped him to flee from the scene of the crime, and this makes him coauthor of the offense subject to prosecution for its commission as well as the defendant. For corroboration purposes, he is therefore an accomplice. *People* v. *Martín*, 275 P.2d 635; *People* v. *Grischott*, 237 P.2d 712; *People* v. *Bonilla*, 12 P.2d 64; *Weston* v. *Commonwealth*, 2 Atl. 191; *Commonwealth* v. *Biddle*, 50 Atl. 262.

Is said witness likewise an accomplice of defendant in the commission of the crime of murder?

■ ■ The evidence shows, although not with much weight, that between the defendant and witness Cintrón Adorno there was an agreement to commit burglary. While the defendant was committing the burglary a person drew near the place and defendant fired several shots with his revolver killing him. Such killing was closely connected with the burglary. The inference drawn from the testimony of Cintrón Adorno is that defendant was actually caught by a person while he was committing burglary, and upon realiz-

ing that he had been discovered he fired his revolver at that person. There are also indicia in the evidence that at that moment defendant had not yet taken out of the store the fruit of the burglary, since the merchandise removed from its customary place was found near the door which had been opened. Under all these circumstances we must conclude that the killing was perpetrated upon committing burglary. This being so, the actors or principals in the commission of burglary are equally responsible criminally for the murder perpetrated while committing burglary, under the rule that where a person conspires with another to commit an unlawful act, every party is responsible criminally for the acts of his coconspirator in furtherance of the common design. I Wharton, Criminal Law and Procedure, § 251 (12th ed. 1957); Annotation at p. 193 of 68 L.R.A.; *Callahan* v. *State*, 71 S.E.2d 86; *Commonwealth* v. *Lowry*, 98 A.2d 733; *White* v. *State*, 228 S.W.2d 165; *Bright* v. *State*, 232 S.W.2d 53. As a general rule it is not essential that the commission of a murder form part of the original design if such murder is or may be one of the probable or foreseeable consequences of the execution of the unlawful act. See Wharton, Homicide, § 439 (3d ed. 1907); *Weston* v. *Commonwealth, supra*; *Commonwealth* v. *Lussier*, 128 N.E.2d 569. A person who is principal or codefendant in an offense of robbery resulting in murder may be found guilty of the latter notwithstanding that his codefendant fired the fatal shot. *People* v. *Simmons*, 172 P.2d 18; *People* v. *Machado*, 309 P.2d 903. Under the specific circumstances concurring in this case, we believe that witness Cintrón Adorno was an accomplice in the commission of murder.

Was there corroborative evidence of the testimony of accomplice Cintrón Adorno? Eliminating his testimony, the evidence establishes, briefly, the following facts:

1—Around seven in the evening of May 24, 1961, the defendant was seen in the company of Pedro Cintrón Adorno

in a filling station in Buchanan where they stopped to fill with gas and oil the car in which both were travelling. (Testimony of Wilfredo Cuadra López.)

2—Between nine thirty and ten of that evening the defendant was seen in the company of Cintrón Adorno in a cafe in the town of Manatí. (Testimony of Víctor Burgos Otero.)

3—Around four in the morning of May 24 going on 25 of the same year a white and red 1957 Chevrolet Bel-Air automobile was seen standing near the store of Herminia Colón situated in the ward of Don Alonso, of Utuado. (Testimony of Benjamín Rivera Candelaria.)

4—That on the road that vehicle passed another operated by Miguel Girona, and that about one minute later Girona arrived in front of the store of Doña Herminia where he saw laborer Narciso Vélez Tirado lying bleeding on the side of the road. (Testimony of Miguel Girona.)

5—That one of the main doors of the store had been forced open and certain merchandise had been removed and placed near the door which had been forced open. (Testimony of Herminia Colón.)

That the body of laborer Narciso Vélez was lying in front of the store. He had a *machete* and a file in his hands and by his side was a flashlight unlighted. (Testimony of Herminia Colón, Benjamín Rivera Candelaria, Miguel Girona, Martín Rubert, and Heraclio Andújar.)

6—That laborer Narciso Vélez received two bullet wounds, one with orifice of entry and exit and the other with orifice of entry only. The bullet was removed from the latter wound and delivered to the district attorney. The other wound caused the laborer's death. (Testimony of Dr. José A. Castro.)

7—Around 10 minutes to six of that morning, on the road leading from Ciales to highway No. 2, the police stopped a beige and red 1957 Chevrolet Bel-Air car in which only the

defendant and the operator, Pedro Cintrón Adorno, were travelling. (Testimony of police officer Félix López Rodríguez.)

8—The police seized under defendant's seat in that vehicle a revolver loaded with five bullets, a box containing 36 bullets, a bullet cartridge, some gloves, and a flashlight. They also seized a crowbar and a screwdriver on the place where the chauffeur rests his feet. At that moment defendant said that he did not know to whom those objects belonged. (Testimony of López Rodríguez.)

9—Since defendant alleged that the previous night he had slept in the ward of Pugnado, of Manatí, the police accompanied him to the place where he allegedly slept and found no signs of someone having slept there. (Testimony of police sergeant Carmelo Méndez Rodríguez.)

10—From a study of the bullet removed from the body of deceased Narciso Vélez and of the revolver seized on defendant, a ballistics expert of the laboratory of the Police of Puerto Rico concluded that the test bullets discharged by that weapon presented the general characteristic and some of the individual characteristics of the bullet found in the deceased's body. The revolver which discharged the bullet submitted to study had the same defect in the alignment of the barrel and the cylinder as that of the revolver seized on defendant. He also concluded that the bullet cartridge seized on defendant was discharged by the revolver which was also seized on defendant. (Testimony of Camilo Arcelay Rivera.)

■ Does this evidence connect the defendant with the commission of the offenses of burglary and murder charged?

■ Let us examine first the evidence on the offense of burglary. It is established beyond any doubt that early in the morning of May 25, 1961, someone, without permission or consent of the owner, broke open the padlock of a door of the commercial establishment of Herminia Colón situated in the ward of Don Alonso, of Utuado, went inside, removed

merchandise and placed it near an open door. This may be sufficient to establish the corpus delicti.[1] Early in the morning of that day a white and red 1957 Chevrolet Bel-Air car was seen standing near the establishment. About two hours later the police stopped, on the road leading from Ciales to highway No. 2, a beige and red 1957 Chevrolet Bel-Air automobile, and which therefore corresponds to the description of the automobile which was parked near the burglarized establishment. Only the defendant and the operator were travelling in that car. The articles seized at that moment in the vehicle—revolver, box of bullets, gloves, flashlight, crowbar, and screwdriver, are articles generally used by burglars. If we consider further the fact that it was false, or that there were no indicia, that defendant slept the previous night at the place which he mentioned in the ward of Pugnado, and that it is true that an unknown person gave him a lift, it may be concluded that the evidence connects the defendant with the commission of the offense of burglary, although it is insufficient by itself to establish his guilt. A false statement made by the accused for the purpose of establishing an alibi is indicatory of guilt. *Commonwealth* v. *Homeyer*, 94 A.2d 743; *Commonwealth* v. *Jones*,

---

[1] In a case such as this the essential elements of the offense of burglary are (1) the unlawful entry into one of the structures enumerated in the Act, and (2) that the entry took place with the specific intent to commit grand or petit larceny. However, "the prosecuting attorney need not prove with direct evidence those two elements of the offense of burglary." Both the illegal entry and the specific intent to commit grand or petit larceny are facts that can be proved with circumstantial evidence, that is, by reasonable inferences which arise from the facts and circumstances proved as a whole. *People* v. *Torres*, 81 P.R.R. 659, 661 (1960). In this case the corpus delicti was also established with the testimony of Cintrón Adorno. The elements of the crime may be established with the uncorroborated testimony of an accomplice. The corroborative evidence required is that which connects the defendant with the commission of the crime. *People* v. *Adorno*, 81 P.R.R. 504, 532 (1959); *People* v. *Harper*, 156 P.2d 249; *People* v. *Negra*, 280 Pac. 354; *People* v. *Griffin*, 219 P.2d 519; *People* v. *Briley*, 48 P.2d 734; *People* v. *Knowles*, 242 Pac. 508.

19 A.2d 389; *Commonwealth* v. *Spardute*, 122 Atl. 161; *Commonwealth* v. *Jones*, 146 Atl. 905.

Even assuming that the evidence presented at the trial, eliminating the accomplice's statement, is likewise insufficient to sustain defendant's conviction of the offense of murder in the first degree, such evidence connects him with the commission of that offense.

■ Apart from the fact that an automobile which answers to the description of the vehicle in which defendant was travelling when he was detained by the police was seen near the scene of the crime, and that that automobile passed another near that place a few minutes after Narciso's body was found, it was established that the revolver seized on defendant had discharged a bullet cartridge which was also seized, and that the bullet removed from the body of Narciso Vélez, who was found dead near the burglarized establishment, had the general characteristic and some individual characteristics of the test bullets discharged with the revolver seized on defendant, and likewise, that one of the bullets which injured Narciso Vélez was discharged by a revolver having the same defect as the revolver seized on defendant, and this is sufficient, in our opinion, to connect the defendant with the death of the said Narciso Vélez. *People* v. *Trujillo*, 194 P.2d 681; *People* v. *Henderson*, 209 P.2d 785; *Starks et al.* v. *State*, 34 So. 687.

■ Although the corroborative evidence should raise something more than a mere suspicion against the accused, it need not go so far as to establish by itself and without the aid of the accomplice's testimony that the accused committed the offense charged. We have repeatedly held that corroborative evidence does not have to be direct, nor very strong, provided it is sufficient to connect the accused with the commission of the offense. *People* v. *Adorno*, 81 P.R.R. 504 (1959); *People* v. *Palóu*, 80 P.R.R. 351 (1958); *People*

v. *Portalatín*, 72 P.R.R. 145 (1951); *People* v. *Rosario*, 68 P.R.R. 526 (1948). See, also, *People* v. *Harper*, *supra*.

■ Considering the entire evidence jointly with the testimony of Pedro Cintrón Adorno, the same is sufficient to establish defendant's guilt beyond a reasonable doubt.

■ In order to dispose of the second assignment to the effect that the trial court erred in finding appellant guilty of the offense of violation of § 8 of the Weapons Law, we need not consider whether the presumption established by § 14 of that Act to the effect that the presence in a vehicle of any prohibited weapon shall be prima facie evidence of its unlawful possession by all the persons occupying the vehicle at the time such weapon is found, is unconstitutional. There was sufficient corroborative evidence which connects the defendant with the commission of that offense, according to the summary which we have already made, and according to the testimony of Cintrón Adorno the defendant was carrying a revolver which discharged several shots at a human being found to be the deceased, Narciso Vélez.

■ The purpose of the challenge of Cintrón Adorno's testimony with the sworn statement given before the district attorney was none other than to impeach the witness' credibility. It was incumbent on the trier of facts to determine the weight and degree of credibility which the witness deserved, and we shall not disturb his discretion save in cases of partiality or manifest error, which, as asserted by the Solicitor General, is not alleged nor arises from the record. *People* v. *Pacheco*, 83 P.R.R. 505 (1961); *Chico de la Rosa* v. *Goetz*, 90 P.R.R. 311 (1964).

The errors assigned not having been committed, the judgments on appeal will be affirmed.